PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2888
_____

UNITED STATES OF AMERICA

v.

MALIK NASIR,

Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-16-cr-00015-001)
District Judge:  Hon. Leonard P. Stark
_____

Argued on November 12, 2019 before Merits Panel
Argued En Banc on June 24, 2020

Before:   SMITH, *Chief Judge*, McKEE, AMBRO,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
SHWARTZ, KRAUSE, RESTREPO, BIBAS, PORTER,
MATEY, PHIPPS, SCIRICA,* and RENDELL,* *Circuit
Judges.*

(Filed: December 1, 2020)

_____

Leigh M. Skipper
Brett G. Sweitzer
Keith M. Donoghue    [ARGUED]
Federal Community Defender Office
   For the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center – Suite 540 West
Philadelphia, PA   19106
        *Counsel for Appellant*

Ilya Shapiro
Cato Institute
1000 Massachusetts Avenue, NW
Washington, DC  20001
        *Counsel for Amicus Cato Institute*

---

* Judges Scirica and Rendell have elected to participate as a member of the en banc court pursuant to Third Cir. I.O.P. 9.6.4.

Jared McClain
New Civil Liberties Alliance
1225 19th Street, NW – Suite 450
Washington, DC   20036
    *Counsel for Amicus New Civil Liberties Alliance*

Evan A. Young
Baker Botts
98 San Jacinto Boulevard – Suite 1500
Austin, TX   78701
    *Counsel for National Association of Home Builders,*
    *American Farm Bureau Federation,*
    *National Cattlemens Beef Association, and*
    *National Mining Association*

David C. Weiss
Robert F. Kravetz   [ARGUED]
Whitney C. Cloud   [ARGUED]
Daniel E. Logan, Jr.
Office of United States Attorney
1313 North Market Street
Hercules Bldg. – Ste. 400
Wilmington, DE   19801
    *Counsel for Appellee*

_____

## OPINION OF THE COURT[**]

_____

   [**] The opinions of Judges McKee, Ambro, Jordan, Greenaway, Jr., Krause, Restrepo, Matey, Scirica, and Rendell are reflected in this Majority Opinion in Sections I, II.D., and II.E., as well as in the Conclusion in Section III of the Opinion,

_____

JORDAN, *Circuit Judge*.

On a tip, Malik Nasir was arrested near a storage unit in which he kept the marijuana he was selling. He was subsequently charged with, and convicted of, two drug offenses and a firearm offense. At sentencing, the District Court applied a career offender enhancement. Nasir now appeals his convictions and challenges the application of that enhancement. We will affirm Nasir's convictions in part but, in light of the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), we will vacate his conviction as a felon in possession of a firearm and remand for a new trial on that charge, as well as for resentencing on the remaining counts of conviction.

---

to the extent the Conclusion addresses subjects considered in Sections II.D and II.E. Judge Bibas has written a concurring opinion as to Section II.D., and Judge Matey has written a concurring opinion as to Section II.E. The opinions of Chief Judge Smith and Judges Chagares, Hardiman, Shwartz, Bibas, Porter, and Phipps are reflected in the Partial Dissent authored by Judge Porter and in Sections I and II.D. of the Majority Opinion, and in the Conclusion in Section III, to the extent the Conclusion addresses the subject considered in Section II.D. The remaining portions of the Majority Opinion represent the precedential decision of the original panel in this case, consisting of Judges Jordan, Scirica, and Rendell.

## I. BACKGROUND

On December 21, 2015, the owner of a storage facility in Dover, Delaware reported to the police suspicious activity at one of the storage units, number C69. The owner asked the police to visit the storage facility to discuss what he believed to be "drug occurrences" on his property. (App. at 90.) When the police arrived, he told them that, over the past several months, someone had visited that unit frequently, as often as five times a day. Each time, the man – whom he identified as Nasir – would enter the storage unit and close the door behind him. Shortly thereafter, he would reemerge and leave the facility. Concerned about illegal activity, the owner had taken a photograph of the inside of the unit, which he showed the officers. It revealed two large coolers, two closed buckets, a box of baggies, a large bag, and an aerosol spray can. The owner provided a copy of a rental agreement signed by Nasir and a photocopy of Nasir's driver's license. The rental agreement listed Nasir's storage unit as C43, not C69, but the police apparently did not notice that discrepancy.[1]

Following up on the information provided by the facility owner, the police ran a criminal history check on Nasir and learned that he had a criminal record that included felony drug convictions. They visited unit C69 with a drug detection dog, and the dog positively alerted to the presence of drugs there. Based on the accumulated evidence, the detectives applied for a search warrant for that unit.

---

[1] Nasir had initially agreed to rent unit C43, but soon after transferred to unit C69.

While awaiting the warrant, several police officers remained at the storage unit, and one surveilled Nasir's home. The officer at the home saw Nasir place a large black bag in the back of a Mercury Mariner SUV and drive in the direction of the storage facility. Nasir in fact went to the facility, and, when he arrived, the officers stopped him as he entered the row of units including numbers C69 and C43. After handcuffing him and putting him in the back of a patrol car, they searched his SUV, where they found a black duffle bag and a key to unit C69.

That same night, a search warrant issued and was executed. In unit C69, the police found more than three kilograms of marijuana, as well as scales and packaging materials. The next day, they applied for and received a search warrant for Nasir's home and any vehicles on the property. While executing the warrant, the officers found $5,000 in cash in a grocery bag in the house and several handguns with ammunition in a Dodge Charger parked on the property.

Nasir was indicted for violating 21 U.S.C. § 856(a)(1), part of what is commonly known as the crack house statute (Count One), and was also charged under 21 U.S.C. §§ 841(a)(1) and (b)(1)(D) for possession of marijuana with intent to distribute (Count Two), and under 18 U.S.C. §§ 922(g)(1) and 924(a)(2) as a felon in possession of a firearm (Count Three). He moved to suppress the evidence obtained from the searches of the storage unit, his house, and his vehicles. The District Court held hearings on that motion and denied it.

At trial, and of particular relevance now, Nasir entered a stipulation with the government as to the charge that he

illegally possessed a firearm. Pursuant to *Old Chief v. United States*, 519 U.S. 172 (1997),[2] he stipulated that, prior to the date when he allegedly possessed the firearm, he had been "convicted of a felony crime punishable by imprisonment for a term exceeding one year, in the United States District Court for the Eastern District of Virginia."[3] (Supp. App. at 21.) The jury convicted him on all three counts of the indictment.

---

[2] *Old Chief* held that defendants in prosecutions under 18 U.S.C. § 922(g)(1) are entitled to enter a stipulation establishing their status as felons (and thus as persons prohibited from possessing firearms), in which case the government cannot introduce evidence establishing what the prior offense was. "The most the jury needs to know is that the conviction admitted by the defendant falls within the class of crimes that Congress thought should bar a convict from possessing a gun, and this point may be made readily in a defendant's admission … ." 519 U.S. at 174, 190–91.

[3] In its entirety, the stipulation stated:

The United States of America, by and through its undersigned attorneys, and James Brose, attorney for Defendant Nasir, hereby stipulate and agree to the following:

Prior to December 21, 2015, the date alleged in Count Three of the Indictment, Defendant Malik Nasir was convicted of a felony crime punishable by imprisonment for a term exceeding one year, in the United States District Court for the Eastern District of Virginia.

7

After the trial, Nasir filed a motion to set aside the verdict and a motion for a new trial, both of which were denied. The District Court sentenced him to 210 months of imprisonment and three years of supervised release, having determined that he qualified as a career offender under the United States Sentencing Guidelines (the "guidelines") because of two earlier convictions in Virginia, one from the year 2000 for attempting to possess cocaine with intent to distribute and one from 2001 for possession of cocaine and marijuana. This timely appeal followed.

## II.    DISCUSSION[4]

Nasir raises five arguments. First, he says that there was insufficient evidence to sustain his conviction under the crack house statute because the section of the statute under which he was convicted does not make it unlawful to store drugs. Second, he argues that the officer who searched the Mercury Mariner did not have probable cause to justify that search, so the evidence found there should have been suppressed. Third, he contends that a member of his jury was avowedly partial, so seating her deprived him of a fair trial. Fourth, he asserts that the career offender enhancement under the guidelines should not have factored into his sentencing because one of his prior felony convictions does not qualify as a "controlled substance offense," as that term is defined in the guidelines. Finally, he

---

(Supp. App. at 21.)

[4]   The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

argues that the government did not prove that he knew he was a felon, as is now required by *Rehaif* in a prosecution under 18 U.S.C. § 922(g), 139 S. Ct. at 2194, so his conviction under that statute for being a felon in possession of a firearm cannot stand.

We will affirm the District Court's denial of Nasir's motion for acquittal as to Counts 1 and 2 and accordingly affirm those convictions. In doing so, we reject Nasir's first three arguments. However, we agree that he does not qualify for the career offender enhancement and must be resentenced. We also hold that his conviction for being a felon in possession of a firearm must be vacated and remanded for a new trial on that count of the indictment.

### A.    The Crack House Conviction

Nasir first challenges his conviction under the crack house statute, specifically 21 U.S.C. § 856(a)(1), which makes it unlawful to "knowingly … lease, rent, use, or maintain any place … for the purpose of manufacturing, distributing, or using any controlled substance." Despite the breadth of that language, Nasir argues that his conviction should be reversed because, he says, that subsection was not meant to cover storage.[5] Nasir did not preserve that argument in the District

---

[5] Nasir does not argue that 21 U.S.C. § 856(a)(1) does not cover storage units; instead, he says that it does not cover the activity of storing. The distinction he attempts to draw is irrelevant here because, as we will explain, there was ample evidence to support the finding that Nasir was not merely storing drugs, he was distributing drugs from a rented place.

9

Court, so we review the denial of his motion for judgment of acquittal for plain error.[6] *United States v. Olano*, 507 U.S. 725, 731 (1993). We will reverse for plain error only if there was an actual error that is plain, that affects "the outcome of the district court proceedings," and that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 734-36 (citations and internal quotation marks omitted) (alteration in original).

Nasir's argument rests on the contrast between subsection (a)(1) of the crack house statute, which he was convicted of violating, and subsection (a)(2), under which he was not charged. That latter subsection declares it unlawful to "manage or control any place, whether permanently or temporarily, … and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, *storing*, distributing, or using a controlled substance." 21 U.S.C. § 856(a)(2) (emphasis added).

According to Nasir, because "storing" is listed as a prohibited activity in subsection (a)(2) but is not mentioned in subsection (a)(1), it was intentionally excluded from (a)(1). By

---

[6] Nasir claims he preserved his position when he raised a sufficiency-of-the-evidence challenge. At trial, Nasir's attorney said, "[s]uccinctly, it's our position that the government has not proved Mr. Nasir in possession of either the firearms or the marijuana." (App. at 549.) But counsel's generic statement, which made no reference to 21 U.S.C. § 856, was not sufficient to preserve a claim of error on this issue.

10

his lights, since he was storing illegal drugs, he should be safe from conviction under (a)(1). But even if we were inclined to accept that subsection (a)(1) does not cover storage, that does not help Nasir. No sensible reading of the statute allows one to distribute drugs just because one is also storing them. Within unit C69, besides the drugs themselves, there was drug distribution paraphernalia, namely scales and packaging materials such as food storage bags. In addition to that evidence, there was the testimony of the facility owner about Nasir's frequent and suspicious trips to the unit. Subsection (a)(1) expressly prohibits "distributing" a controlled substance from any rented place, and the jury was presented with more than ample evidence that Nasir was doing just that. The District Court properly instructed the jury that it could find Nasir guilty of violating section 856(a)(1) if he used a "place for the purpose of manufacturing, *distributing*, or using any controlled substance." (App. at 615 (emphasis added).) There was thus an obvious and legitimate basis for his conviction under the crack house statute, and the District Court's denial of Nasir's motion for a judgment of acquittal was not error at all, let alone plain error.

### B. The Motion to Suppress Evidence from the SUV

Nasir also appeals the denial of his motion to suppress the evidence retrieved in the search of his Mercury Mariner SUV. He repeats the argument he made in the District Court, saying that the officer who searched the SUV lacked probable cause. We review *de novo* whether there was probable cause to justify police action. *United States v. Vasquez-Algarin*, 821 F.3d 467, 471 (3d Cir. 2016).

The legal theories offered in opposition to and support of the SUV search have morphed over time. They began with Nasir objecting to the search as the proverbial fruit of the poisonous tree. He said the "[p]olice did not have cause to arrest [him] at the time he arrived at the storage facility parking lot and accordingly all statements made by him and any evidence found subsequent to his arrest should be suppressed." (App. at 47.) In responding to that motion, the government said that the search of the SUV "was a lawful search incident to a valid arrest pursuant to *Arizona v. Gant*, 556 U.S. 332 (2009)." (App. at 60 n.21.) The government also stated that, at the suppression hearing, it "would present evidence that the search … was a valid inventory search[,]" although apparently it did not do so. (App. at 60 n.21.) In his post-hearing rebuttal briefing before the District Court, Nasir argued that the search of the SUV was unlawful as a search incident to arrest and as an inventory search. The District Court ultimately classified the search as being incident to Nasir's arrest but noted that, even if the search had occurred prior to the arrest, "the search of the vehicle appears to have been within the scope of the automobile exception" to the warrant requirement of the Fourth Amendment. (App. at 21 n.4 (citations omitted).)

On appeal, Nasir simply asserts that there was no probable cause to search the SUV, without specifying the legal framework for analysis.[7] We conclude that the District Court

---

[7] Although Nasir pointed out in his briefing that the arresting officer said he "[b]asically … looked at [the search] as an inventory search," (App. at 138,) that does not appear to have been the theory that the government pursued before the District Court or now pursues on appeal.

correctly approached the issue as being a search incident to arrest. Even when, like Nasir, an arrestee is detained and not within reach of his vehicle, the police may conduct "a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343 (citation and internal quotation marks omitted). Whether viewed as a question of probable cause to arrest Nasir or probable cause to search the SUV under the automobile exception, however, the pertinent facts and the outcome are the same.

In challenging the search of the SUV, Nasir says that the evidence uncovered in that vehicle – a black duffle bag and the key to unit C69 – should have been suppressed because the investigating officers did not corroborate the tip from the storage facility owner. Nasir characterizes the owner as an unknown and unreliable informant, and he lays particular emphasis on the incorrect unit number on the rental agreement the owner provided to the police. Nasir also argues that the District Court impermissibly attributed information known only to officers not present at the search to the officer who actually conducted the search. His arguments are unpersuasive.

When the police receive information from an informant for the first time, they have a duty to independently corroborate at least some of the information the informant provides. *See Illinois v. Gates*, 462 U.S. 213, 242 (1983) ("[A]n officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." (citation and internal quotation marks omitted)). They discharged that duty in this case. The

13

arresting officers personally knew the following at the time of the arrest and related search of the vehicle: according to a background check, Nasir had a history of drug dealing; the owner of the storage facility had reported Nasir engaged in suspicious activity at unit C69, including making numerous trips to the storage unit, sometimes several in a day; the owner had taken a photograph that showed items in the unit consistent with drug distribution; an officer had seen Nasir put a bag in the back of his car and drive toward the storage facility; and a narcotics dog had positively alerted to drugs at unit C69.

Given the totality of those circumstances known to the officers who arrested Nasir, there was certainly probable cause, reasonably corroborated, for Nasir's arrest, and it was reasonable to believe that evidence of his drug dealing would be found in the SUV.[8]  We will therefore affirm the District Court's denial of Nasir's motion to suppress.

## C.    The Ruling on Alleged Juror Bias

---

[8] We note, as did the District Court, that even if the search had been performed prior to Nasir's arrest, "the search of the vehicle appears to have been within the scope of the automobile exception." (App. at 21 n.4 (citations omitted).)  It is well established that under the automobile exception to the warrant requirement, the police may search a vehicle if they have probable cause to believe that the vehicle contains evidence of criminal activity.  *Carroll v. United States*, 267 U.S. 132, 155-56 (1925).  Here, the same facts that gave rise to probable cause for an arrest can rightly be seen as independently giving rise to probable cause for a search of the vehicle.

14

Nasir next claims that he was deprived of a fair and impartial jury because one of the jurors at his trial, Juror 27, did not unequivocally affirm that she would be impartial. Our review of a ruling on a motion to strike a juror for cause is for manifest error – a most deferential standard. *Skilling v. United States*, 561 U.S. 358, 396 (2010). The Supreme Court has emphasized that jury selection is "particularly within the province of the trial judge" and cautioned against "second-guessing the trial judge's estimation of a juror's impartiality[.]" *Id.* at 386 (citation and internal quotation marks omitted).

During voir dire, one of the questions the District Court asked to determine juror partiality was, "Would you give more or less weight to the testimony of a law enforcement agent or police officer than you would give to that of a civilian witness, simply because he or she is employed as a law enforcement agent or police officer?" (App. at 237-38.) Because Juror 27 answered "yes" to that question, the following colloquy ensued:

> A JUROR: […] But the other thing that I kind of answered "yes" to was police officer and a person on the street. I would like to think I would be partial (sic), but I don't know.
>
> THE COURT: You would like to think you would be impartial and fair to both sides?
>
> A JUROR: Yes, impartial that is what I would like to say.
>
> THE COURT: What is your concern you wouldn't be?
>
> A JUROR: Well, my daughter dates a state police officer. And I really have a lot of respect

15

for them, you know, and I feel that for the most part they all do a good job, and they try to be fair. I think I might tend to believe what they say. I don't know.

THE COURT: Do you think if I instruct you that you have to be fair and impartial and assess everybody's credibility as best as you can that you would be able to do that?

A JUROR: I would think I would. I would hope I would.

(App. at 305.) Then, outside the juror's presence the Court and counsel had this further conversation:

[NASIR'S ATTORNEY]: Your Honor, I move to strike on the basis that she -- her daughter is dating a state police officer and she would tend to believe the officer and police testimony.

THE COURT: What is the government's position?

[GOVERNMENT'S ATTORNEY]: Your Honor, I don't have a real strong one. That she would answer any questions that she was instructed [sic]. She could stay impartial. She confronted all those issues. I certainly understand why [Defense counsel] is objecting.

THE COURT: Any response?

[NASIR'S ATTORNEY]: No response, Your Honor.

THE COURT: I'm going to deny the motion. I felt sufficient confidence that she would work as hard as anyone could to be fair and impartial, and

16

I think she would follow the instructions. So I'm denying the motion to strike.

(App. at 306-07). Nasir argues that the statements "I would think I would" and "I would hope I would" are not sufficiently strong affirmations of impartiality.

Because the juror admitted to her concern about partiality, the District Court quite rightly asked follow-up questions to determine whether she was actually biased. *Cf. United States v. Mitchell*, 690 F.3d 137, 142 (3d Cir. 2012) (holding that actual bias is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality[,]" unlike implied bias, which is "presumed as [a] matter of law" (citations and internal quotation marks omitted)). Here, Juror 27's acknowledgement that she "ha[s] a lot of respect for" police officers and "might tend to believe what they say" prompted the District Court to emphasize her obligation to be fair and impartial and to weigh the evidence equally. (App. at 305.) She responded with assurances that she would follow the Court's instructions. Her declaration that she "would think" and "would hope" (App. at 305) that she could be impartial – combined, it seems, with the way in which she said it – allowed the District Court, observing her behavior and mannerisms first hand, to have "sufficient confidence that she would work as hard as anyone could to be fair and impartial." (App. at 306-07.) That decision, on this record, is not manifestly erroneous.

### D.    The Career Offender Enhancement

Nasir next challenges the enhancement he received at sentencing pursuant to the "career offender" provision of the sentencing guidelines. He argues that he should not have

17

received the enhancement because one of his two prior qualifying convictions was an inchoate drug offense, which does not qualify as a predicate offense under the plain language of the guidelines. The interpretation of the guidelines is a legal question, so we exercise plenary review. *United States v. Wilson*, 880 F.3d 80, 83 (3d Cir. 2018). We agree with Nasir that the plain language of the guidelines does not include inchoate crimes, so he must be resentenced.

### 1. *The Definition of "Controlled Substance Offenses" in the Guidelines*

Under section 4B1.1 of the sentencing guidelines, an adult defendant is a career offender if "the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and … the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). If a defendant is a career offender, that designation increases the offense level of the crime for which he is to be sentenced and mandates a criminal history ranking of Category VI. U.S.S.G. § 4B1.1(b).

The District Court determined that one of Nasir's three convictions in this case is a controlled substance offense, namely his conviction on Count Two for possession of marijuana with intent to distribute. After evaluating Nasir's criminal history, the Court concluded that two of his prior convictions in Virginia state court also qualify as predicate controlled substance offenses: a 2000 conviction for an attempt to possess with intent to distribute cocaine and a 2001 conviction for possession of marijuana and cocaine with intent

18

to distribute.[9]  Nasir was accordingly sentenced as a career offender.

He argues that his conviction in 2000 for attempting to possess with intent to distribute cocaine should not qualify as a "controlled substance offense" under section 4B1.1 because the guidelines' definition of a "controlled substance offense" does not include inchoate crimes.[10]  In particular, Nasir points out that section 4B1.2 of the sentencing guidelines defines the term "controlled substance offense," to mean

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

---

[9] Nasir has other prior convictions, but the government and Nasir appear to agree than none of them qualify as predicate offenses.

[10] An inchoate offense is "[a] step toward the commission of another crime, the step itself being serious enough to merit punishment."  Offense, *Black's Law Dictionary* (11th ed. 2019).  Inchoate offenses include, for example, the attempt, conspiracy, or solicitation to commit a crime. *Id.*

19

U.S.S.G. § 4B1.2(b).  Nasir notes this definition plainly does not mention inchoate crimes, and consequently asserts that his inchoate "attempt" crime should not qualify as a predicate offense for the career offender enhancement.  The analytical problem is more complicated than that, however, because the commentary to section 4B1.2 appears to expand the definition of "'controlled substance offense' [to] include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."  U.S.S.G. § 4B1.2 cmt. n.1.  That section of the commentary, and, importantly, our precedent on the application of the commentary to the interpretation of the guidelines, informed the District Court's decision to apply the career offender enhancement.  The question, then, is whether the more expansive commentary should be given controlling weight in interpreting the narrower guideline at issue here.[11]

> 2. *The Effect of the Commentary on our Interpretation of the Guidelines*

---

[11] The Sentencing Commission has proposed an amendment to the guidelines to explicitly include inchoate offenses in section 4B1.2(b). *Notice of Proposed Amendments*, 83 Fed. Reg. 65400-01, 65412-15 (Dec. 20, 2018).  The proposed change has been submitted for notice and comment, and the time for notice and comment has closed.  *Id.*  However, the Commission does not currently have a quorum (and has not had one since at least 2018), so it cannot act on that issue.  U.S. Sentencing Commission, 2018 Annual Report 2-3, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/2018-Annual-Report.pdf.

The extent to which the guidelines' commentary controls our interpretation of the guidelines themselves is informed by principles of administrative law. In *Stinson v. United States*, 508 U.S. 36 (1993), the Supreme Court considered how to classify the commentary to the sentencing guidelines and whether and when it should be given binding interpretive effect. Because the guidelines are written by the Sentencing Commission, a body that straddles both the legislative and judicial branches of the government, the Court determined that the commentary to the guidelines is more akin to an agency regulation than a statute. *Id.* at 44. Consequently, the Court determined that the commentary should "be treated as an agency's interpretation of its own legislative rule." *Id.* Relying on its opinion in *Bowles v. Seminole Rock & Sand Co.*, the Court said that such determinations should be given deference unless they are "plainly erroneous or inconsistent with the regulation." *Id.* at 45 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). Further, the Court instructed that, "if the guideline which the commentary interprets will bear the construction," the commentary can expand the guidelines, particularly when the commentary is "interpretive and explanatory." *Id.* at 46-47. Accordingly, so-called *Seminole Rock* deference, also sometimes called *Auer* deference,[12] governs the effect to be given to the guidelines commentary.

---

[12] In 1945, the Supreme Court upheld a regulation from the Office of Price Administration in *Bowles v. Seminole Rock*, after it determined that the language of the regulation was consistent with Administration's interpretation of the regulation. *Seminole Rock*, 325 U.S. at 417. *Seminole Rock* thus became shorthand for the doctrine of deference to an administrative agency's interpretation of its own regulations.

21

Our precedent has followed that course. In *United States v. Hightower*, 25 F.3d 182 (3d Cir. 1994), we applied the principles set forth in *Stinson* to determine whether inchoate crimes are covered by sections 4B1.1 and 4B1.2 of the sentencing guidelines. We asked "whether the Sentencing Commission exceeded its statutory authority by expanding the definition of a controlled substance offense" when it included inchoate offenses as part of the definition of the term "controlled substance offense" in the commentary to section 4B1.2. *Hightower*, 25 F.3d at 184 (internal quotation marks omitted). We determined that the commentary to 4B1.2 was explanatory and therefore binding. *Id.* at 185-87. Specifically, although we admitted that the inclusion of inchoate crimes was an "expansion of the definition of a controlled substance offense[,]" we said that the expansion was "not 'inconsistent with, or a plainly erroneous reading of,' § 4B1.2(2) of the [s]entencing [g]uidelines, and that it does not 'violate[ ] the Constitution or a federal statute.'" *Id.* at 187 (second two alterations in original) (quoting *Stinson*, 508 U.S. at 38). We later followed that precedent in *United States v. Glass*, 904 F.3d 319 (3d Cir. 2018), in which we held that a conviction under a Pennsylvania "attempt" statute qualified as a predicate controlled substance offense for the career offender enhancement under the guidelines.

---

More than fifty years later, in *Auer v. Robbins*, 519 U.S. 452 (1997), the Court reinforced that doctrine. The doctrine is thus sometimes referred to as *Seminole Rock* deference, after the case that introduced it, and at other times referred to as *Auer* deference, the more recent reiteration of the doctrine.

Our interpretation of the commentary at issue in *Hightower* – the same commentary before us now – was informed by the then-prevailing understanding of the deference that should be given to agency interpretations of their own regulations. Thus, although we recognized that the commentary expanded and did not merely interpret the definition of "controlled substance offense," we nevertheless gave it binding effect. In doing so, we may have gone too far in affording deference to the guidelines' commentary under the standard set forth in *Stinson*. Indeed, after the Supreme Court's decision last year in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), it is clear that such an interpretation is not warranted.

In *Kisor*, the Court cut back on what had been understood to be uncritical and broad deference to agency interpretations of regulations and explained that *Auer*, or *Seminole Rock*, deference should only be applied when a regulation is genuinely ambiguous. *Id.* at 2414-15. *Kisor* instructs that "a court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on. Doing so will resolve many seeming ambiguities out of the box, without resort to *Auer* deference." *Id.* at 2415 (citation, brackets, and quotation marks omitted). Thus, before deciding that a regulation is "genuinely ambiguous, a court must exhaust all the traditional tools of construction." *Id.* (citation and quotation marks omitted).

Even when a regulation is ambiguous, there are limits to deference. The agency's reading must be "reasonable[,]" as informed by "[t]he text, structure, history, and so forth[,]" which "establish the outer bounds of permissible interpretation." *Id.* at 2415-16. A court "must make an

23

independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight[,]" including whether it is the agency's "official position[.]" *Id.* at 2416. Moreover, an agency's interpretation must "in some way implicate its substantive expertise" if it is to be given controlling weight, since "[s]ome interpretive issues may fall more naturally into a judge's bailiwick." *Id.* at 2417. Finally, the reading must "reflect fair and considered judgment" and not simply be a "convenient litigating position." *Id.* (citations and quotation marks omitted). In short, the degree of deference to be given an agency's interpretation of its own regulations is now context dependent.

### 3. *Plain Text and Policy*

The definition of "controlled substance offense" in section 4B1.2(b) of the guidelines is, again, in pertinent part as follows:

> [A]n offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b). The guideline does not even mention inchoate offenses. That alone indicates it does not include them. The plain-text reading of section 4B1.2(b) is strengthened when contrasted with the definition of "crime of

24

violence" in the previous subsection. That definition in section 4B1.2(a) does explicitly include inchoate crimes, *see* U.S.S.G. § 4B1.2(a) ("The term 'crime of violence' means any offense … that – (1) has as an element the use, *attempted* use, or threatened use of physical force against the person of another[.]" (emphasis added)), which further suggests that the omission of inchoate crimes from the very next subsection was intentional.

That suggestion is separately bolstered by the fact that section 4B1.2(b) affirmatively lists many other offenses that do qualify as controlled substance offenses. As a familiar canon of construction states, *expressio unius est exclusio alterius*: the expression of one thing is the exclusion of the other. Applying that canon has led at least one court of appeals to conclude that section 4B1.2(b) does not include inchoate crimes. *See United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018) ("Section 4B1.2(b) presents a very detailed 'definition' of controlled substance offense that clearly excludes inchoate offenses.").

There is an important additional policy advantage to the plain-text approach: it protects the separation of powers. If we accept that the commentary can do more than interpret the guidelines, that it can add to their scope, we allow circumvention of the checks Congress put on the Sentencing Commission, a body that exercises considerable authority in setting rules that can deprive citizens of their liberty. Unlike the guidelines, the commentary "never passes through the gauntlets of congressional review or notice and comment." *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc) (per curiam); *see also United States v. Swinton*, 797 F. App'x 589, 602 (2d Cir. 2019) (quoting same and remanding

25

for resentencing with an instruction for the district court to "consider again whether, in light of the concerns addressed in *Havis* and *Winstead*, the career offender [g]uideline applies" to a defendant whose predicate offenses for the career offender enhancement include a conviction for attempted criminal sale of a controlled substance).

On that basis, along with the plain text of the guidelines, another of our sister courts of appeals has rejected the notion that commentary to 4B1.2(b) can expand the guidelines' scope. *See Havis*, 927 F.3d at 386. (Because it has not been approved by Congress, "commentary has no independent legal force—it serves only to *interpret* the [g]uidelines' text, not to replace or modify it."). We too agree that separation-of-powers concerns advise against any interpretation of the commentary that expands the substantive law set forth in the guidelines themselves. *Cf.* 28 U.S.C. § 995(a)(20) (granting the Sentencing Commission power to "*make recommendations* to Congress concerning modification or enactment of statutes relating to sentencing[.]" (emphasis added)).

In light of *Kisor*'s limitations on deference to administrative agencies, we conclude that inchoate crimes are not included in the definition of "controlled substance offenses" given in section 4B1.2(b) of the sentencing guidelines. Therefore, sitting en banc, we overrule *Hightower*, and accordingly, will vacate Nasir's sentence and remand for resentencing without his being classified as a career offender.

### E.  The Felon-in-Possession Conviction

The final issue on appeal concerns Nasir's conviction under 18 U.S.C. § 922(g) for being a felon in possession of a

26

firearm. After Nasir filed his opening brief, the Supreme Court decided *Rehaif v. United States*, holding that, "in a prosecution under … § 922(g) …, the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." 139 S. Ct. at 2200. The latter half of that holding – that the government must prove that the defendant knew of his status as a person prohibited from having a gun – announced a newly found element of the crime. For a defendant like Nasir, a previously convicted felon, that knowledge-of-status element means that the government has to prove that he knew he was a "person … who has been convicted … of … a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Proving that a felon knew he possessed a gun remains necessary but is no longer sufficient for a conviction. Proof of knowledge of status is now essential.

*Rehaif* represents a reevaluation of an old and oft-invoked criminal statute. Nasir responded to the Supreme Court's opinion by promptly filing a supplemental brief, arguing that his conviction as a felon in possession of a firearm cannot stand since the government did not provide any evidence to prove the knowledge-of-status element of the crime. He admits, though, that he did not voice an objection to that at trial. We therefore review for plain error.

Again, the test for plain error under *United States v. Olano* proceeds in four steps and requires the defendant to prove that there was (1) an actual error (2) that is plain or obvious, (3) that affected "the outcome of the district court proceedings," and (4) that "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*,

27

507 U.S. at 734-36 (citations omitted). Even if the first three steps of the test are met, the fourth step grants us a degree of discretion in determining whether to correct the error.[13] Whether the alleged error is plain is evaluated based on the law at "the time of appellate review[,]" regardless of whether it was plain at the time of trial. *Henderson v. United States*, 568 U.S. 266, 269 (2013). The government concedes that, in light of *Rehaif*'s applicability in this case, Nasir has satisfied the first two steps of *Olano*. The dispute here is whether the third and fourth steps are satisfied.

Before directly addressing those steps, however, it bears repeating that, until *Rehaif*, § 922(g) had not been understood as the Supreme Court interpreted it there. No knowledge-of-status element had previously been perceived in the statute, and

---

[13] Our dissenting colleagues say that, in addressing whether to correct the conceded plain error in this case, we have failed to appreciate the purpose of plain error review under Federal Rule of Criminal Procedure 52(b). (Dissent at 2-4.) In particular, the Dissent says that we "seem[] to suggest a presumption in favor of error-correction." (Dissent at 4.) But we've said nothing of the sort. The import of our statement here should be clear: it is not enough to win on the first three prongs of *Olano*, because you can still lose at prong four. The implication is quite the opposite of what the Dissent attributes to us. The disagreement between our opinion and the Dissent hinges not on what Rule 52(b) means but, as we shall explain, on whether, given the type of error under consideration, we are free to look beyond the trial record when deciding if we should exercise our discretion under that rule.

no proof of it was required.[14] It is hardly surprising, then, that the government did not offer any evidence at Nasir's trial that

[14] The Dissent implies that the knowledge-of-status element was somehow well known before *Rehaif*. But to say, as our dissenting colleagues do, that "the scienter issue was hardly a secret at the time of Nasir's trial," is to set up a straw man. (Dissent at 3.) It is true that scienter was understood to be a required point of proof in a § 922(g) prosecution, but the knowledge that had to be proven was the defendant's knowledge that he possessed a firearm. While the Dissent has been able to identify a very few – three – dissenting opinions in appellate cases suggesting a knowledge-of-status element, such scienter was not a holding in any case, it appears, except for a single unreported district court case from many years ago. The small handful of judges who anticipated the Supreme Court's turn by a dozen years deserve credit, but that hardly warrants the Dissent's effort to paint the knowledge-of-status element as something that was current in conversation within the bench and bar. Far from it. As Justice Alito noted in his dissent in *Rehaif*, the Supreme Court majority in that watershed case "overturn[ed] the long-established interpretation of an important criminal statute, ... an interpretation that ha[d] been adopted by every single Court of Appeals to address the question" and an interpretation that "ha[d] been used in thousands of cases for more than 30 years." 139 S. Ct. at 2201. So we think our emphasis on the unexpected and striking impact of *Rehaif* is fully justified.

What is not justified is the Dissent's suggestion that Nasir's failure to object "deprived the government and trial court of … opportunities" to "supplement the record with additional evidence of Nasir's *mens rea*." (Dissent at 4.) Regardless of whether the knowledge-of-status element

29

he knew he was a felon, and the District Court did not instruct the jury that such proof was necessary. Since *Rehaif*, the government has claimed that the evidence admitted at the trial in this case was adequate to prove that, when Nasir was found with guns in his possession, he knew he was a felon and hence a person prohibited from possessing a firearm. But, perhaps recognizing how unconvincing that characterization of the evidence is, the government has spent the majority of its efforts in this appeal on a more plausible but still ultimately unsuccessful argument: that, even if the record is devoid of proof on the knowledge-of-status element, we should not recognize and correct the error on plain-error review because Nasir surely did know that he was a felon.

That brings us to the difficult and dividing issue in this case, one that has elicited a variety of responses from other courts of appeals dealing with the aftermath of *Rehaif*. The

---

was widely recognized before *Rehaif*, the government's burden of proving that element, and every other element of the § 922(g) charge, was the same. Nothing that Nasir did or didn't do at trial affected that. Failure to object at trial begets plain-error review on appeal; it does not reverse the constitutionally mandated burden of proof and does not put the government on moral high ground in our assessment of the consequences of plain error, as the Dissent seems to think. If the Dissent wants to think in terms of fault – an exercise that seems unproductive, especially in light of the marked change in the law wrought by *Rehaif* – then surely some fault must fall on the government for failing to recognize that knowledge-of-status is an element of the offense and therefore failing to introduce evidence about Nasir's knowledge of his prior felony.

assertion that Nasir knew he was a felon is founded entirely on information that his jury never saw or heard, so the question is whether an appellate court on plain-error review is restricted to the trial record or is instead free to consider evidence that was not presented to the jury. We conclude that, even on plain-error review, basic constitutional principles require us to consider only what the government offered in evidence at the trial, not evidence it now wishes it had offered. Accordingly, we will vacate Nasir's conviction for being a felon in possession of a firearm and will remand for a new trial on that charge.[15]

---

[15] Nasir raises three *Rehaif*-based challenges to his conviction: that the indictment was defective for omitting knowledge-of-status as an element of the crime, that the jury was not properly instructed that knowledge-of-status is an element of the crime, and that the government did not present sufficient evidence of knowledge-of-status. While we are persuaded by Nasir's last argument and recognize some merit in the second, we see no merit at all in the first. The language of the indictment echoes the language of the statute, stating that Nasir "did knowingly possess in and affecting interstate and foreign commerce, firearms … after having been convicted of a crime punishable by imprisonment for a term exceeding one year[.]" (App. at 40-41.) The indictment thus mirrors the language of the statute by listing the "knowingly" mens rea element first, allowing it to modify the other elements of the crime. *See Hamling v. United States*, 418 U.S. 87, 117 (1974) ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" (quoting

1.  *Due Process and the Right to Trial by Jury Limit our Review to the Trial Record*

As stated by the Supreme Court in *In re Winship*, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. 358, 364 (1970). The government has to prove its case to the "proper factfinder," and "[d]ue process commands that no man shall lose his liberty unless the Government has borne the burden of … convincing the factfinder of his guilt." *Id.* In the context of a jury trial such as Nasir's, the requirements of due process are further bolstered by the Sixth Amendment, which allocates the role of "proper factfinder" to the jury, and to the jury alone. Indeed, going back at least as far as Blackstone, it has been a given that the jury – not appellate judges after the fact – must find "the truth of every accusation" for a conviction to be sustained.[16]   4 William

---

*United States v. Carll*, 105 U.S. 611, 612 (1882)). Because the language of the indictment is not uncertain or ambiguous, there was no error, much less plain error, in allowing prosecution of the § 922(g) count of the indictment.

[16] On this point, we are in full agreement with the concurrence of our colleague Judge Matey, which eloquently emphasizes the right to trial by jury. Although our colleagues in dissent say that they "do not purport to 'find facts' in order to overcome a deficiency in the evidence and on that basis pronounce the defendant's conviction while relieving the government of its burden" (Dissent at 7), that is precisely the effect of their position. If no facts were given to the jury from

32

Blackstone, *Commentaries on the Laws of England*, *343-44. The jury has "an unquestionable right" to decide the case, "for, if the judge's opinion must rule the verdict, the trial by jury would be useless." *Id.* at *354-55. Accordingly, to secure a conviction that is consistent with its constitutional obligations, the government must present evidence to the jury to prove beyond a reasonable doubt every single element of the crime.

Notably, no one questions that if we were reviewing a sufficiency-of-the-evidence objection that had been preserved at trial, our review would be confined to the trial record. Only evidence and argument that had actually been proffered would matter. That foundational point, rooted as it is in the Due Process Clause of the Fifth Amendment, serves as a bright-line rule, buttressed by the Sixth Amendment's guarantee of trial by jury. The question before us thus becomes whether the plain-error standard of review permits us to disregard the demands of the Due Process Clause and the Sixth Amendment and to affirm a conviction when no evidence was presented to the jury on one of the elements of the charged offense. We think the answer to that question has to be no.

To rule otherwise would give us free rein to speculate whether the government *could have proven* each element of the offense beyond a reasonable doubt at a *hypothetical* trial that established a different trial record. But no precedent of the Supreme Court or our own has ever sanctioned such an

---

which the existence of an element of the charged crime can be determined, and if the appellate court then searches outside the trial record to discover facts that will fill that void, those appellate judges are indeed finding facts to decide the case. That is antithetical to the right to a jury trial.

approach. To the contrary, given the dictates of the Due Process Clause, as described in *Winship*, 397 U.S. at 364, our inquiry must necessarily focus on whether the government *did prove* – or at least introduced sufficient evidence to prove – each element of the offense beyond a reasonable doubt at the *actual* trial. And Nasir's right to trial by jury reinforces that point: "Consistent with the jury-trial guarantee, the question [that precedent] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict *in the case at hand*." *Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993) (emphasis added).

Plain error is a deferential standard, to be sure, but it does not alter fundamental constitutional precepts.[17] Accordingly, the Supreme Court has limited itself to the trial record in analogous cases. The exact procedural posture we are in now was present in *Johnson v. United States*, 520 U.S.

---

[17] This may be where our views and those of our dissenting colleagues diverge most dramatically. The Dissent says we are "fixate[d] on *Winship*'s requirement of proof beyond a reasonable doubt in criminal trials" and have a "misconception of plain-error review [that] infects [our] entire discussion of the record … ." (Dissent at 8.) Since *Winship* only said what the Constitution itself requires, the Dissent might just as well say we are fixated on the Constitution. The intimation is that, if we really understood plain-error review under Rule 52(b), we would not be so bothered by someone's being convicted without a shred of proof having been introduced at trial on one of the elements of the charged offense.

34

461 (1997). The defendant in that case was convicted of perjury, but, before her direct appeal to the Eleventh Circuit was concluded, the Supreme Court handed down an opinion holding that the materiality of a false statement had to be decided by a jury rather than the trial judge. *Id.* at 463-64. The defendant had not objected at trial to the judge being the one who made the decision on materiality, because no one at the time knew there was such an objection to be made. *Id.* at 464. The Eleventh Circuit decided that the error inherent in the judge rather than the jury making the materiality decision did not affect the defendant's substantial rights. *Id.* In other words, it decided the case at *Olano* step three. It made that decision, though, not in spite of a government failure to carry the constitutionally mandated burden of proof but precisely because the government had carried its burden so fully. As described by the Supreme Court, the Eleventh Circuit conducted an "independent review of the record and determin[ed] that … 'overwhelming' evidence of materiality" had been provided to the jury, so "[n]o reasonable juror" could have decided the materiality question in any way other than as the trial judge did. *Id.* at 465 (second alteration in original).

The Supreme Court agreed with the outcome but took a different analytical path. It did not address the plain-error analysis in *Johnson* at *Olano* step three, as the court of appeals had. Instead, it went directly to step four, and, accepting that the evidence on materiality in the trial record was so "overwhelming" that a rational jury could not reach any conclusion but guilt, the Court decided that the fairness, integrity, and reputation of the judicial process could not be called into question by the conviction. *Id.* at 469-70. The argument for reversal on plain error failed, in other words, based on the trial record. *Johnson* thus highlights the

35

importance of the government carrying its constitutional burden at trial.[18]

---

[18] The Dissent asserts that our "insistence that [the *Olano*] prong-four analysis is … limited to the time of trial (as memorialized in the trial record) is unwarranted and finds no support in *Johnson*." (Dissent at 6.) We will leave to thoughtful readers to decide who has more faithfully considered the text of *Johnson*. Suffice it to say that our reading finds ample support in that text and makes perfect sense, particularly in light of later Supreme Court pronouncements, like those in *Neder v. United States,* 527 U.S. 1 (1999).

In *Neder*, a similar legal error was at issue. As in *Johnson*, the district court wrongly decided the issue of the materiality of false statements, this time in a case that included the filing of false tax returns. Over the defendant's objection, the district judge had instructed the jury that the question of materiality was for the court alone to decide. Looking at the evidence produced by the government *at trial*, the trial judge found that "the evidence established the materiality of all the false statements at issue." *Id.* at 6. The Eleventh Circuit affirmed the conviction. On review, the Supreme Court applied the harmless-error standard from *Chapman v. California*, 386 U.S. 18 (1967), because the defendant had lodged an objection to the ruling at issue (in contrast to Nasir and the defendant in *Johnson*, both of whom were left with plain-error review because they failed to object). In the end, the Supreme Court said that the jury-instruction error was harmless because there was so much evidence of materiality *in the trial record* that "no jury could reasonably find that Neder's failure to report substantial amounts of income … was not a 'material matter.'" 527 U.S. at 16. So again, it was not in spite

36

Given the due process and Sixth Amendment concerns in play here, we are not free to suppose what the government could have proven at a different trial. The only relevant question, even on plain-error review, is what the government did prove at this trial. Nevertheless, while the constitutional implications of *Rehaif* seem clear to us, they are not beyond dispute, as the close division among us in this en banc appeal shows and as is further evidenced by decisions from our sister circuits.

2.      *The Differing Approaches of Other Courts of Appeals*

With one exception,[19] other courts of appeals that have considered whether the government's failure to prove the

---

of the government's failure to carry its burden of proof but rather because it had carried its burden so overwhelmingly that the Court upheld the conviction.

[19] In *United States v. Medley*, 972 F.3d 399 (4th Cir. 2020), the Fourth Circuit vacated a defendant's jury trial conviction on plain-error review after *Rehaif* because the indictment did not allege knowledge-of-status, the government had presented no evidence of knowledge-of-status at trial, and the jury was not instructed to find knowledge-of-status. However, the Court did not address the issue we confront here, namely whether we are restricted to the trial record on plain-error review of a jury conviction. It is noteworthy, though, that the majority in that case appeared to take it as given that it was limited to the trial record, *id.* at 417 (noting that the government "provided substantial post-trial evidence

37

knowledge-of-status element in a 922(g) prosecution is plain error have decided that it is not. They have reached that result based on their preliminary conclusion that they are permitted to look outside the trial record to find evidence to plug the gap left by the prosecution at trial. The justifications offered for that view are not all of a piece. *See United States v. Huntsberry*, 956 F.3d 270, 284 (5th Cir. 2020) ("We note that our sister courts have taken different paths on this issue.").

Under one line of thinking, the Supreme Court's decision in *United States v. Vonn*, 535 U.S. 55 (2002), authorizes consideration of the entire record, not just the trial record, at step three of plain-error review of a jury verdict, even though *Vonn* was decided in the context of a guilty plea. *United States v. Ward*, 957 F.3d 691, 695 & n.1 (6th Cir. 2020); *United States v. Reed*, 941 F.3d 1018, 1021 (11th Cir. 2019). A second rationale holds that a reviewing court is limited to the trial record on the first three steps of plain-error review but may look to the entire record at the fourth step, which involves the exercise of discretion in considering potential harm to the reputation of the judiciary. *United States v. Owens*, 966 F.3d 700, 706-07 (8th Cir. 2020); *United States v. Maez*, 960 F.3d 949, 961 (7th Cir. 2020); *United States v. Miller*, 954 F.3d 551,

supporting [the defendant's] knowledge of his prohibited status" but "declin[ing] the Government's invitation to engage in the level of judicial factfinding that would be required to affirm," given the trial record), while the dissent appears to have assumed that it was not so limited, *id.* at 419-20 (Quattlebaum, J., dissenting) (asserting that the conviction should be sustained because the defendant had previously served more than twelve years in prison for second-degree murder, information that was not presented to the jury).

560 (2d Cir. 2020). We respectfully disagree with both of those perspectives, neither of which can comfortably co-exist with our own precedent, nor, to our thinking, with due process, the Sixth Amendment, or relevant Supreme Court authority.

The trailblazer on the first path – the one resting on the Supreme Court's decision in *Vonn* – was the Eleventh Circuit in *United States v. Reed*, a case initially decided on the basis of the pre-*Rehaif* state of the law. 941 F.3d at 1019. When the case reached the Supreme Court on certiorari, the Court vacated the judgment and sent the matter back for further proceedings consistent with *Rehaif*. *Id.* On remand, the Eleventh Circuit determined that, even though it was reviewing a conviction after a jury trial, it could nonetheless "consult the whole record when considering the effect of any error on [the defendant's] substantial rights." *Id.* at 1021. As authority for that premise, the Court cited *Vonn*, which held that, when a defendant has entered a guilty plea and later asserts on appeal that there was a failure to ensure the plea's voluntariness through a colloquy under Rule 11 of the Federal Rules of Criminal Procedure,[20] "a [previously] silent defendant has the burden to satisfy the plain-error rule and that a reviewing court may consult the whole record when considering the effect of any error on substantial rights." 535 U.S. at 59; *see Reed*, 941 F.3d at 1021. Other circuits have cited *Reed* for the premise that, on plain-error review, an appeals court may satisfy itself of an element with evidence that was never presented to a jury.

---

[20] Under Rule 11, if the defendant has pled guilty, "the court must address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement)." Fed. R. Crim. P. 11(b)(2).

*See United States v. Mancillas*, 789 F. App'x 549, 550 (7th Cir. 2020); *cf. Ward*, 957 F.3d at 695 n.1 (6th Cir. 2020) (citing *Vonn*, 535 U.S. at 59).

The problem with *Reed* and the cases that follow it, however, is that *Vonn* involved review of the voluntariness of a guilty plea, a procedural posture that is completely unlike the review of a conviction following trial. In *Vonn*, the Supreme Court held that, in ascertaining the adequacy of a Rule 11 colloquy, a reviewing court may look beyond the colloquy to the record created at a defendant's initial appearance and arraignment "[b]ecause … defendants may be presumed to recall information provided to them prior to the plea proceeding[.]" *Vonn*, 535 U.S. at 75. The focus was, appropriately, on the information known to the defendant at the time of the plea because, when a defendant pleads guilty, the district court must ensure that the plea is knowing and voluntary. That's the job at the plea stage because it is what due process demands in that context. *McCarthy v. United States*, 394 U.S. 459, 466 (1969) ("[I]f a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void."). And the reviewing court's job is to make sure of the same thing, which makes it logical to look at what a defendant was told at earlier stages of the criminal proceedings.

The question is quite different when reviewing whether the government has borne at a trial – or even at a plea proceeding[21] – its burden to "convince the trier [of fact] of all

---

[21] Because we of course acknowledge that a guilty plea must be knowing and voluntary, the Dissent concludes that we are "comfortable inferring a defendant's knowledge-of-felon

the essential elements of guilt." *Winship*, 397 U.S. at 361 (citation omitted). In that procedural setting, due process and Sixth Amendment considerations compel us to focus our inquiry on the information presented to the trier of fact – in this case, the jury. *Vonn* is inapposite where, as here, we are concerned not with the facts possessed by the defendant and their effect on the voluntariness of his plea but with the information presented to the fact-finder to prove an element of the charged offense. Put differently, when there has been a plea rather than a trial, no one is concerned about or mentions the adequacy of the trial record because there is none. Likewise, however, when there has been a trial and an utter

---

status from his prior guilty plea." (Dissent at 9 n.5.) The Dissent therefore faults us for refusing to consider Nasir's three prior guilty pleas – especially one for a felon-in-possession charge. That conviction is one that our colleagues especially emphasize as a "central reason" not to correct the plain error here. (Dissent at 9 n.5.) But the fact that a guilty plea must be knowing and voluntary has no bearing on whether we may consider a guilty plea that was never presented to the jury. What divides us has nothing to do with the strength of the evidence outside the trial record. It has everything to do with whether, consistent with constitutional safeguards, we can properly go outside the trial record. And to the extent the Dissent suggests that the government is free to ignore the elements of the charged offense at a plea colloquy, we disagree with that as well. The government must always make a record demonstrating a factual basis for the crime to which the plea is entered.

failure of proof is at issue, it is simply beside the point to rely on case law dealing with the voluntariness of plea colloquies.[22]

---

[22] The Dissent asserts that *United States v. Young*, 470 U.S. 1 (1985), supports its position, and the position taken in *Reed*, 941 F.3d at 1020-21, that we must consider evidence outside the trial record when applying *Olano* step four. (Dissent at 14-15.) Not so. Although *Young* does refer to "the entire record," it does so in a way that, in context, makes plain that what the Supreme Court was referring to was the entire *trial* record. The full quote from *Young* reads as follows:

> Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded: "In reviewing criminal cases, it is particularly important for appellate courts to relive *the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure*. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution." It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means.

470 U.S. at 16 (emphasis added) (internal citation and quotation marks omitted).

Far from supporting the Dissent or *Reed*, that statement emphasizes that our focus is supposed to be on the actual field of play – the trial – to see whether the government has fulfilled its constitutional obligations in a way that preserves the fairness and integrity of the prosecution and maintains the confidence of the public. The trial record is the only place to

The second rationale adopted by some courts for going beyond the trial record acknowledges that a reviewing court is restricted to the trial record at the first three steps of plain-error review, but then holds that the fourth step changes the scope of review. Since the fourth step of *Olano* calls for the exercise of discretion, and since that discretion must account for potential harm to the reputation of the judiciary, those courts say it is fine to look outside the trial record because the public will. The reasoning is, in effect, that the defendant is obviously guilty and the justice system will not appear to have served justice if, through no fault of the prosecution, the defendant is freed on the technicality that proof of a previously unknown element of the offense was not offered in evidence.[23]

which one rightly *can* look if what is being considered is the trial supposedly under review. For purposes of *Olano* step four, and for this type of error, the trial is the only judicial proceeding at issue.

[23] Applying a different version of this approach, the Fifth Circuit at first declined to answer whether it was limited to the trial record on plain-error review but determined that it could judicially recognize facts at the fourth step of plain-error review, including a defendant's prior state convictions. *See Huntsberry*, 956 F.3d at 285-86. Subsequently, however, the Fifth Circuit decided that it is permitted to look outside the trial record at the fourth step. *See United States v. Staggers*, 961 F.3d 745, 756 (5th Cir. 2020); *see also United States v. Burden*, 964 F.3d 339, 348 n.8 (5th Cir. 2020). In another post-*Rehaif* case, the First Circuit similarly indicated that judicial notice might be a proper path to resolution, but in the end, it did not take that path. *United States v. Lara*, --- F.3d ---, Nos. 17-1957,

The Second Circuit took essentially that approach in *United States v. Miller*. In analyzing a *Rehaif* challenge to jury instructions, the court decided that "the substantial-rights analysis [, *i.e.*, the *Olano* step three question,] in [the defendant's] case is a difficult one, given the paucity of factual development at trial pertaining to a question that was not discerned before *Rehaif* was decided." 954 F.3d at 559. Because the step-three question was difficult, the court chose "to resolve [the] case on the fourth prong of plain-error review[,] … which does not necessarily confine us to the trial record." *Id.* The court cited no authority for that postulate about being free to roam beyond the trial record. It asserted it and then, noting that the presentence investigation report provided ample evidence that the defendant must have known he was a felon, and referencing his stipulation at trial, concluded that the fairness and integrity of the judicial system would not be questioned, even though there was a "paucity" of evidence of his guilt presented at trial. *Id.* at 559-60.

The Seventh Circuit has adopted the same kind of approach. In *United States v. Maez*, it began by explaining why *Vonn* is not applicable when reviewing jury convictions,

17-1964, 2020 WL 4668535, at *13 (1st Cir. Aug. 12, 2020) (noting that "the government had available to it evidence of [the defendant's] four recent and serious convictions from Maine," and although it did not present that evidence at trial, "we regularly take judicial notice of … state court records given their presumed reliability"). For the reasons discussed herein, however, we are unpersuaded that judicial notice can properly be used as a means to circumvent a defendant's rights to due process and trial by jury.

44

distinguishing that case as we have above and saying, "[t]he Supreme Court has made clear that harmless-error analysis [performed at *Olano* step three] looks only to the trial record to measure the effect of trial error." *Maez*, 960 F.3d at 961. It reasoned that such a "restriction to the jury record flows logically from the nature of a substantial-rights inquiry on direct review." *Id.* When asking whether a trial error affected substantial rights, "[t]he more abstract question of the defendant's actual guilt or innocence is not the issue. Rather, the appellate court asks what effect the error could have had on the verdict in the trial actually conducted." *Id.* But the court then decided that, because the fourth step of plain-error review is a separate, discretionary step, reviewing courts may, and perhaps should, consider claims of actual innocence. *Id.* at 962. Having determined that appellate courts "have broad discretion under prong four to leave even plain errors uncorrected where we have no doubt as to the ultimate result of further proceedings[,]" the court decided that step-four "discretion necessarily implies some power to look beyond the trial record to assess an error's effect, at least for the errors argued here, where … [*Old Chief*] prevented the government from offering a great deal of circumstantial evidence showing" knowledge-of-status.[24] *Id.* at 963. The only authority cited for looking beyond the trial record was the Second Circuit's decision in *Miller*.[25] *Id.*

---

[24] Subsequently, the Seventh Circuit has exercised its discretion to recognize the plain error in a post-*Rehaif* challenge to a § 922(g) conviction. *See United States v. Cook*, 970 F.3d 866 (7th Cir. 2020).

[25] The First Circuit has also recently joined the ranks of the Second and Seventh Circuits, saying that "the Supreme

45

Court has never suggested that we are categorically barred from taking into account evidence not introduced at trial in considering whether an instructional error satisfies the fourth prong of plain-error review." *Lara*, 2020 WL 4668535, at * 13. Although the Court acknowledged the due process concerns in "revis[ing] the basis on which a defendant is convicted simply because the same result would likely obtain on retrial," *id.* at *14 (citation omitted), it nonetheless characterized a reversal in this context as "wasteful" and declined to exercise its discretion to notice the error on the fourth prong of plain-error review, *id.* at *13-14.

Similarly, the Ninth Circuit has decided that examination of evidence outside the trial record is permissible to avoid "wasteful reversals." *United States v. Johnson*, No. 17-10252, 2020 WL 6268027, at *4 (9th Cir. Oct. 26, 2020) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004)). The court's *Johnson* decision had an earlier iteration in which the expressed rationale for looking outside the trial record was the availability of a retrial in the case and the court's conclusion (suspect, in our view) that the Double Jeopardy Clause is the source of the ordinary prohibition on going beyond the trial record when conducting appellate review. *United States v. Johnson*, 963 F.3d 847, 851 (9th Cir. 2020) (vacated). While the unusual Double Jeopardy rationale may have made a cameo appearance in the most recent version of *Johnson*, *see* 2020 WL 6268027, at *4 ("To satisfy the fourth prong *when a retrial would be permissible*, a defendant must offer a plausible basis for concluding that an error-free retrial might end more favorably." (emphasis added)), the court's stated basis for looking past the government's proof at trial is now more in line with the *Olano* prong four analysis in *Miller* and *Maez*.

Our disagreement with this fourth-step approach is that it treats judicial discretion as powerful enough to override the defendant's right to put the government to its proof when it has charged him with a crime.[26] We do not think judicial discretion trumps that constitutional right, and neither *Miller* nor *Maez* cite any pre-*Rehaif* authority supporting a contrary conclusion. Moreover, those decisions and the ones that follow them are independently troubling to the extent they imply that relief on

---

[26] As discussed below, we think the existence of an *Old Chief* stipulation has little relevance to the analysis and, thus, disagree with the Seventh Circuit's conclusion that it was justified in straying from the trial record on that basis. To the extent that either the Second or Seventh Circuit (or any other court of appeals) sought to make a broader point that going beyond the trial record was permissible because the government presented all of the evidence it needed to, given the state of the law prior to *Rehaif*, our views again diverge. Whether fair to the government or not, it does not matter that the change in the law came after trial. The Supreme Court has said that the error must be measured based on the law at the time of appeal. *See Henderson*, 568 U.S. at 273 ("*Johnson* explicitly rejects applying the words 'plain error' as of the time when the trial judge acted. Instead, *Johnson* deems it 'enough that an error be "plain" at the time of appellate consideration' for that error to fall within Rule 52(b)'s category of 'plain error.'" (quoting *Johnson*, 520 U.S. at 468)). There will be cases that fall in the gap between the state of the law at trial and the state of the law on appeal. This is one.

plain-error review is available only to the innocent.[27]  That is a proposition the Supreme Court put to rest in *Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018), when it observed that "*Olano* rejected a narrower rule that would have called for relief only … where a defendant is actually innocent." *Id.* at 1906.

And as for any objection that technicalities can be overlooked on plain-error review, we do not accept that the question of whether we are confined to the trial record is a mere technicality.  It is, in our view, a matter of the highest importance.  The word "technicality" is too often used to denigrate a principle that stands between an advocate and a preferred result.  "All law is technical if viewed solely from

---

[27] The Dissent suggests the same.  Indeed, the consistent theme of the Dissent is that, when evidence outside the trial record is considered, it is so obvious that Nasir is guilty that we are "profoundly mistaken" (Dissent at 1) in "persist[ing]" in our desire to correct a plain error of constitutional magnitude that has affected Nasir's substantial rights. (Dissent at 19.) "[I]n the face of overwhelming, reliable information supporting Nasir's conviction" (Dissent at 19), our persistence is explained as "a reflexive inclination … to reverse because of unpreserved error[.]" (Dissent at 19 (quoting *Puckett v. United States*, 556 U.S. 129, 134 (2009)).)  Our view, however, is more reflective than reflexive and is consistent with the Supreme Court's instruction that "the public legitimacy of our justice system relies on procedures that are neutral, accurate, consistent, trustworthy, and fair, and that provide opportunities for error correction." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018) (internal quotation marks and citation omitted).

48

concern for punishing crime without heeding the mode by which it is accomplished." *Bollenbach v. United States*, 326 U.S. 607, 614-15 (1946). The Constitution puts procedural safeguards in place to protect against just such an approach. Given the imperative of due process, and "[i]n view of the place of importance that trial by jury has in our Bill of Rights," it should not be supposed that "the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, [can be substituted] for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be." *Id.* at 615.

In sum, we disagree with both variants of the rationales that other courts of appeals have adopted to justify unmooring themselves from the trial record when conducting plain-error review.[28] Given our view of the due process and jury trial

---

[28] The Dissent relies heavily on the several cases we have just discussed and others following them, counting the number of courts and judges and asking, "[h]ow could so many federal judges approve the obvious violation of important Fifth Amendment and Sixth Amendment rights?" (Dissent at 13.) We are certainly aware that thoughtful people can analyze the plain-error conundrum here differently than we have. But then, not long ago, there was a contrary consensus that plain-error relief is warranted when the trial record is "devoid of evidence." *See United States v. Castro*, 704 F.3d 125, 138 (3d Cir. 2013) (citation omitted) (collecting cases). More to the point, however, we are making an independent judgment, as we are required to do, and counting up judges who see the issue differently does not alter our obligation. The answer to the old saw that "fifty million Frenchmen can't be wrong" is yes, they can. *Rehaif* itself is an example of everyone except the

49

rights at issue, our analysis of Nasir's claim of plain error will be confined to the trial record and the evidence the government actually presented to the jury.

### 3. *Applying Plain-Error Review*

Turning to the trial record, and with the first two steps of the plain-error test from *Olano* not in dispute, the only questions left for our consideration are whether the admitted plain error of a conviction on proof of less than all of the elements of the 922(g) charge affected Nasir's substantial rights (*Olano* step three) and whether we should exercise our discretion to notice the error (*Olano* step four). On this record, the answer to both questions is yes.[29]

---

Supreme Court seeing an issue the same way and, given the Supreme Court's position in our judicial hierarchy, all of them being wrong.

[29] That is not to say that all post-*Rehaif* cases should be resolved in favor of the defendant. Despite the Dissent's assertions to the contrary, we are not advocating nor effectively establishing a *per se* rule. Each case must be decided on its own facts. For example, there have been cases where sufficient evidence was presented at trial to show that the defendant was aware of his status as a felon at the time of the crime. *See, e.g., United States v. Moss*, 812 F. App'x 108, 111 (4th Cir. 2020) (rejecting a *Rehaif*-based challenge because "[d]uring his direct testimony, [the defendant] stated that he was well aware of his prohibited status because of his prior convictions."); *United States v. Velázquez-Aponte*, 940 F.3d 785, 800 (1st Cir. 2019) (reciting evidence supporting a § 922(g) conviction after *Rehaif* and noting that, at trial, "the government submitted a

a)     *Olano* step three

To show that an error affected his substantial rights, Nasir must "'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different."[30]  *Molina-Martinez v. United States*, 136 S. Ct.

_____

certified copy of a prior Puerto Rico court judgment reflecting that [the defendant] was convicted of a felony in state court" at trial and "read portions of it to the jury," including the sentence).  The Dissent asserts that these cases are "inapposite" because they did not feature *Old Chief* stipulations. (Dissent at 11.)  But whether there is an *Old Chief* stipulation is irrelevant.  *Old Chief* was explicit that it does not prevent the introduction of evidence of a prior conviction "for any purpose beyond proving status," 519 U.S. at 190, so proving knowledge of status was never forbidden by *Old Chief* and is expressly sanctioned by  Federal Rule of Evidence 404(b), which states that "[e]vidence of a crime, wrong, or other act is … admissible for … proving … knowledge[.]"  Therefore, as explained further herein, *Old Chief* stipulations do not prevent the government from introducing knowledge-of-status evidence, as is evident from their continued use post-*Rehaif*.  The Dissent engages in pure speculation when it insists that, but for the stipulation in this case, the government would have introduced such evidence, or that the trial court would have sustained an objection to it.  (*See* Dissent at 11.)

[30] Although we agree with Nasir that his conviction under § 922(g) was plainly erroneous after *Rehaif*, we do not agree with his assertion that the error was structural.  The Supreme Court has said that "structural errors are a very

51

1338, 1343 (2016) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76 (2004)).  As to his sufficiency-of-the-evidence challenge,[31] we ask whether the evidence the government presented at trial would have been sufficient to sustain a conviction on the knowledge-of-status element.  Because literally no evidence was presented concerning Nasir's knowledge of his status as a felon, it is at least

---

limited class of errors[.]"  *United States v. Marcus*, 560 U.S. 258, 263 (2010) (citation and internal quotation marks omitted).  Those circumstances are not present here, and we are not inclined to extend the structural error doctrine.  We have already said that "[t]rial errors resulting from a failure to submit an element of an offense to the jury are not structural defects, but instead, are subject to harmless or plain error analysis."  *United States v. Vazquez*, 271 F.3d 93, 103 (3d Cir. 2001) (en banc).  That is consistent with the Supreme Court's decisions in *Neder* and *Johnson*, which held that a judge's mistake in taking from the jury the responsibility to determine the existence of an element of the crime was not structural error.  (*See supra* II.E.1.)

[31] Nasir also alleges plain error with respect to the jury instruction on the elements of a § 922(g) offense, but we need not consider those arguments, given our disposition of the sufficiency-of-the-evidence challenge.  Failure to instruct the jury as to an element of the crime is trial error, and "[t]he prosecution therefore is free to retry [the] defendant."  *McMullen v. Tennis*, 562 F.3d 231, 237 (3d Cir. 2009); *see also United States v. Cohen*, 301 F.3d 152, 158 (3d Cir. 2002) (Alito, J.) ("The usual remedy for an error in a jury instruction is retrial[.]").

reasonably probable, if not certain, that the jury would not have found there was proof beyond a reasonable doubt of the knowledge-of-status element, if it had known it was required to consider that element.

The government nevertheless argues that the situation here calls for a different result because the defendant stipulated that he was a felon, pursuant to *Old Chief*, 519 U.S. 172. According to the government, it was prohibited from giving any further details about Nasir's criminal record, so it could not have adduced evidence that he knew of his status. That argument echoes a concern raised by Justice Alito in his dissent in *Rehaif*, in which he said that, now that the government has to prove knowledge-of-status, "under … [*Old Chief*], it is questionable whether a defendant, by offering to stipulate that he has a prior conviction, can prevent the prosecution from offering evidence about the nature of that offense. And the admission of that information may work to a § 922(g) defendant's detriment." *Rehaif*, 139 S. Ct. at 2209 (Alito, J., dissenting). We understand Justice Alito as making the point that discovering a knowledge-of-status element in § 922(g) was potentially inconsistent with the protections the Supreme Court intended *Old Chief* to extend to defendants, and that inconsistency, Justice Alito indicated, stood as another reason why the Court's interpretation of § 922(g) in *Rehaif* was incorrect.

We do not, however, read anything in *Rehaif*, or *Old Chief* itself, as suggesting that the government could not have introduced knowledge-of-status evidence at trial. To the contrary, the Supreme Court was explicit in *Old Chief* that its restrictions on evidence concerning the defendant's previous felony applied "only when the record of conviction would not

53

be admissible for any purpose beyond proving status," so that "if, indeed, there were a justification for receiving evidence of [the conviction] on some issue other than status (*i.e.*, *to prove . . . 'knowledge*, . . .'*), [then Federal Rule of Evidence] 404(b) [would] guarantee[] the opportunity to seek its admission." 519 U.S. at 190 (emphasis added).

Nor did *Old Chief* preclude adding a simple knowledge-of-status statement to the stipulations the government regularly enters with defendants in § 922(g) cases. By its plain terms, *Old Chief* only prevents the government from presenting evidence about the name or nature of the defendant's prior felony conviction. A knowledge-of-status statement included in a stipulation addresses neither of those things. Indeed, such additional language need not reveal any information about a defendant's felonious past, only that he was aware of it at the time of the offense under consideration. Events in the real world bear that out. As the Seventh Circuit has noted, "[i]n the wake of *Rehaif*, defendants and the government have begun agreeing to modified *Old Chief* stipulations that also include knowledge of felon status." *Maez*, 960 F.3d at 959.

The government also argues that a fair inference, especially on plain-error review, is that Nasir's acknowledgement of his conviction in the *Old Chief* stipulation[32] means he also acknowledged he knew of his status as a felon ever since becoming one. But *Rehaif* itself blocks

---

[32] For the language of the stipulation in its entirety, *see supra* note 3.

54

that line of reasoning.[33]    The Supreme Court said there that it did not believe "Congress would have expected defendants under § 922(g) … to know their own status[ ]." *Rehaif*, 139 S. Ct. at 2197.  If one were to conclude otherwise, the Court said, "these provisions might apply to a person who was convicted of a prior crime but sentenced only to probation, who does not know that the crime is '*punishable* by imprisonment for a term exceeding one year.'"    *Id.* at 2198 (quoting 18 U.S.C. § 922(g)(1)).

In the natural course, a defendant agrees to an *Old Chief* stipulation after having committed the crime of unlawfully possessing a firearm.  Nasir's stipulation, for example, post-dates his offense by sixteen months.  All the stipulation demonstrates is that he knew he was a felon at the time he signed the stipulation; based on the stipulation alone, it cannot rightly be said that he knew of his status as a felon when he possessed the firearms at issue.[34]  In other words, a stipulation

---

[33] That is not to say that the government's argument is without support.  *See Ward*, 957 F.3d at 696 ("A rational juror could also have inferred that [the defendant] knew he was a felon when he possessed the gun.  [He] made an *Old Chief* stipulation at trial, pursuant to which he acknowledged that he 'was a convicted felon on and prior to the date of the charged conduct[.]'  [His] lawyer also told the jury that [the defendant] was 'stipulating that he has a felony.  So you can check that one off the box.'  The jury could have inferred from these statements that [the defendant] also knew that he was a felon.").

[34] While the Dissent agrees that the stipulation does not "*necessarily* prove that [Nasir] knew he was a felon when he

55

of the sort submitted in this case will not, on its own, suffice to prove that, at the relevant time, the defendant had knowledge of his status as a person prohibited to possess a firearm.[35]

---

was arrested with the gun[,]" it nonetheless asserts that "[a] thoughtful observer drawing upon her reason, experience, and common sense might easily infer from Nasir's June 2017 stipulation that he knew of his felon status when apprehended with a gun in December 2015." (Dissent at 15-16 n.9.) How a thoughtful observer would get to that conclusion at all, let alone easily, can only be explained by going outside the trial record. On the basis of what is in that record, only an illogical leap could get to that conclusion. Again, Nasir entered into his *Old Chief* stipulation long after he was apprehended with the guns, and he stipulated only that he was a felon; he did not stipulate to his state of knowledge at the time of the alleged crime. A thoughtful observer, therefore, would not – indeed could not – rightly infer knowledge-of-status at the relevant time from the *Old Chief* stipulation, either alone or in combination with anything else the Dissent can point to. There simply is no basis for that inference in the trial record.

[35] The government also argues that, because Nasir agreed to an *Old Chief* stipulation, the situation is analogous to one where the defendant invited the error. But that argument is a non-starter since, under our precedent, the invited-error doctrine does not apply where the law changes between trial and appeal. *United States v. Andrews*, 681 F.3d 509, 517 n.4 (3d Cir. 2012); *United States v. West Indies Transp., Inc.*, 127 F.3d 299, 305 (3d Cir. 1997).

The government tries to get around its lack of evidence by saying that, at trial, it showed Nasir was furtive about his drug dealing and so he must have known when he possessed his guns that he was a convicted felon.[36] But the inference simply does not follow. Criminal behavior is nearly always furtive; it's in the very nature of the thing. Criminals know enough to hide their criminality, if they can. Nasir's furtiveness proves only that he knew his drug dealing could get him into trouble, not that he knew he was a previously convicted felon.[37] If the government's argument were accepted, prosecutors in a typical case involving drugs and guns could put on no more evidence than was offered before *Rehaif* and then, by calling the defendant's behavior furtive, gain a conviction. That would render *Rehaif* a nullity and is

[36] Specifically, the government points to "the evidence of subterfuge involving the use of the separate storage facility to store drugs and drug paraphernalia [and] the fact that he had a secondary vehicle in which he had an arsenal of five semiautomatic firearms." (En Banc Oral Argument at 1:03:45–1:04:35; see also App. at 393–94 (trial testimony describing Nasir's behavior at the storage facility as involving "frequent visits" to a "small unit" where Nasir "would go inside and come back out").)

[37] The government further argues that the fact Nasir kept his weapons hidden and locked in the trunk of his car shows he knew he was prohibited from possessing firearms. If we were to accept that argument, it might imply that a gun owner who responsibly keeps his guns safely locked away is somehow admitting his ownership of them is illicit. We think the inference unwarranted.

obviously not an option. *Rehaif* declares knowledge of status to be an element of a § 922(g) offense, and that cannot be ignored.

The Fourth Circuit has recently come to the same conclusion. In *United States v. Medley*, 972 F.3d 399 (4th Cir. 2020), it recognized plain error when the government presented no evidence to sustain a conviction on the knowledge-of-status element.[38] *Id.* at 402-03. There too, the government asserted that the defendant's *Old Chief* stipulation was evidence of knowledge-of-status, as was his "attempt to evade the police[.]" *Id.* at 414-15. The court disagreed, noting that "[i]nferring that someone knew he was prohibited from possessing a firearm at the time of the offense based on a stipulation at trial that he was in fact a prohibited person would render the Supreme Court's language in *Rehaif* pointless." *Id.* at 414. It also noted that the defendant's "attempt to evade the police … does not indicate—much less overwhelmingly prove—that he knew his prohibited status under federal law." *Id.* at 415.

---

[38] In *Medley*, the Fourth Circuit found plain error and prejudice in the indictment, in the jury instructions, and in the sufficiency of the evidence presented at trial. *Id.* at 419. It then exercised its discretion to recognize the error at step four of plain-error review, in light of the cumulative effect of those three errors. *Id.* Rather than delving into our agreements or disagreements with the majority and dissenting opinions in that case, we note that we certainly agree with the foundation of the majority's analytical approach – that due process and the right to a jury trial are implicated here.

As was the Fourth Circuit in *Medley*, we are faced here with a case in which there is no evidence at all on an essential element of the felon-in-possession charge, and yet the case was submitted to the jury and there was a conviction. We have said in unmistakable terms that "affirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt 'affect[s] substantial rights[.]'" *United States v. Gaydos*, 108 F.3d 505, 509 (3d Cir. 1997) (quoting *Olano*, 507 U.S. at 732) (first alteration in original). That conclusion is "consistent with the Supreme Court's instruction that due process requires 'proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" *United States v. Xavier*, 2 F.3d 1281, 1287 (3d Cir. 1993) (quoting *Winship*, 397 U.S. at 364.). Nasir's substantial rights were thus definitely affected by his conviction upon proof of less than all of the elements of the offense outlawed by § 922(g), and he has carried his burden at *Olano* step three.

b) *Olano* step four

The final question, at *Olano* step four, is whether we should exercise our discretion to notice the error because it is of a sort that would "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. Given the significant due process and Sixth Amendment concerns at issue, which we have already discussed at length, we are convinced that it is indeed that sort of error.

The Supreme Court recently affirmed in *Rosales-Mireles* that an error need not "shock the conscience" or amount to a "powerful indictment of the system" to be "worthy of correction" at step four of a plain-error analysis. 138 S. Ct.

59

at 1906-07 (internal quotation marks omitted). Again, the Court said that "*Olano* rejected a narrower rule that would have called for relief only" in cases "where a defendant is actually innocent." *Id.* at 1906. It recognized instead "a broader category of errors that warrant correction on plain-error review." *Id.* Innocence or guilt, insofar as we may think we apprehend them based on the trial record, may have relevance, but our analysis at the fourth step "focus[es] … on principles of fairness, integrity, and public reputation[.]" *Id.*

That means that sometimes the errors to be corrected are "inadvertent or unintentional errors of the court or the parties below." *Id.* In *Rosales-Mireles*, the error was the District Court's miscalculation of the guidelines range at sentencing. *Id.* at 1905. Such errors had already been recognized as being likely to affect a defendant's substantial rights, when considered under the third step of plain-error review. *See Molina-Martinez*, 136 S. Ct. at 1345 ("When a defendant is sentenced under an incorrect [g]uidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error."). The Supreme Court extended that reasoning to *Olano* step four, saying that "'[t]o a prisoner,' th[e] prospect of additional 'time behind bars is not some theoretical or mathematical concept' … [and] thus warrants serious consideration in a determination whether to exercise discretion under Rule 52(b)." *Rosales-Mireles*, 138 S.C.t at 1907 (quoting *Barber v. Thomas*, 560 U.S. 474, 504 (2010) (Kennedy, J., dissenting)). The Court observed that "[i]t is crucial in maintaining public perception of fairness and integrity in the justice system that courts exhibit regard for

60

fundamental rights and respect for prisoners as people." *Id.* at 1907 (internal quotation marks omitted).

If a guidelines miscalculation warrants recognition of plain error, surely a plain error of constitutional dimension going to the conviction itself deserves to be recognized and corrected.[39] Nasir was deprived of the right to have a jury

[39] We do not suggest, as the Dissent contends, that "plain-error review is inapplicable whenever important constitutional rights are at issue." (Dissent at 8 n.4.) Instead, we faithfully apply our discretion at *Olano* step four within the confines of the trial record, evaluating whether the constitutional deprivation at issue seriously impugns the fairness, integrity, and public reputation of judicial proceedings. By limiting the scope of our review to the trial record, we decline to act as a factfinder or to do the government's job for it. That exercise of judicial restraint does not create a *per se* rule, nor does it "challenge[ ] the constitutionality of Rule 52(b)'s plain-error standard as explicated in Supreme Court decisions[,]" as the Dissent charges. (Dissent at 9 n.4).) There are cases, as we've previously noted (*supra* note 29), in which sufficient evidence was presented at trial to show that a defendant was aware of his status as a felon at the time of the crime charged. *See*, *e.g.*, *Moss*, 812 F. App'x at 111; *Velázquez-Aponte*, 940 F.3d at 800. Thus, it is not a foregone conclusion that every defendant convicted before *Rehaif* under § 922(g) – even every such defendant who entered into an *Old Chief* stipulation – will succeed on plain error review. *Old Chief* stipulations do not now prevent, nor have they ever prevented, the government from introducing knowledge-of-status evidence. To the contrary, the government has already begun including

consider whether the government had proven him guilty beyond a reasonable doubt on every element of the § 922(g) charge. As forcefully described in the concurrence on this point, upholding that outcome would amount to an appellate court, in the jury's stead, "mak[ing] a factual determination on an unproven element of an offense by considering documents outside the evidentiary record," in derogation of the Sixth Amendment. (J. Matey Concurrence at 2.) Whether viewed as a matter of the Fifth Amendment's guarantee of due process or the Sixth Amendment's promise of trial by jury, or both, a deprivation of those essential rights "seriously impugns 'the fairness, integrity and public reputation of judicial proceedings[,]'" and thus satisfies step four of *Olano*. *Gaydos*, 108 F.3d at 509 (quoting *Olano*, 507 U.S. at 732).

That cannot be swept aside because of dissatisfaction with the rule that plain error is decided on the basis of the law as it stands at the time of appeal. *See Johnson*, 520 U.S. at 468 (plainness of a trial error must be judged "at the time of appellate consideration"). True enough, the rules of the game changed here, when the decision in *Rehaif* came down after the trial. That, however, does not change our constitutional norms. Members of the public know that the government is supposed to prove a defendant's guilt at trial. Everybody acknowledges that that was not done in this case, though it was nobody's "fault." Were we to ignore that breach of due process and then try to explain our choice by saying, "well, we all know he's

_____

knowledge-of-status affirmations within *Old Chief* stipulations. *Maez*, 960 F.3d at 959. The variable, therefore, never was the stipulation; it was the government's lack of awareness that it had to prove the knowledge-of-status element.

guilty," it should not sit well with thoughtful members of the public. Nor should our taking over the jury's role, for the sake of efficiency. Disregarding constitutional norms may be taken as tantamount to saying that rules constraining the government really don't count when we just know someone is guilty.[40]

---

[40] Faulting us for adhering firmly to the demands of due process, the Dissent asserts that "framing the plain error as a due-process violation does not automatically satisfy *Olano* prong three or four." (Dissent at 5.) We agree. Labels are not what matter; substance is. To recap, looking at what happened in this case, and considering *Olano* prong three, not even our dissenting colleagues try to say that the government actually offered at trial any evidence of Nasir's knowledge of his status as a previously convicted felon. So, again, there was a complete failure of proof on that essential element of the § 922(g) charge, and it ought to be a matter of common understanding that a failure to prove all the elements of an offense does affect substantial rights, as our past precedent tells us. *See United States v. Jones,* 471 F.3d 478, 480 (3d Cir. 2006) ("[A]ffirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt affect[s] substantial rights … ." (internal quotation marks omitted) (second alteration in original)). So prong three is satisfied here, not because we are "framing" the government's failure as one of due process but because it indisputably *is* a matter of due process, implicating one of the most fundamental protections afforded to an accused. As for prong four of *Olano*, we likewise are not saying that labels carry the day. We are focused on the fundamental right, enshrined in the Due Process Clause, that no one will be deprived of liberty without the government carrying its burden to prove guilt beyond a reasonable doubt. When that is at issue,

63

That is a message likely to call into question the fairness, integrity, and reputation of the justice system. We will therefore exercise our discretion to recognize the plain error in Nasir's § 922(g) conviction.

### 4. *The Remedy for the Plain Error*

We view this case as a misapprehension about the law – one shared by everyone in the courtroom, and perhaps across the nation, until *Rehaif.* That misapprehension led to the government's failure to present sufficient evidence to sustain the conviction.[41] Though a failure of proof usually results in acquittal, the Double Jeopardy Clause is not implicated when

as it is here, we believe it does bring the judicial process into disrepute to ignore what the Constitution requires. *See id.* ("[A]ffirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt … seriously impugns the fairness, integrity and public reputation of judicial proceedings." (internal quotation marks omitted)). We are not asking for anything to be "automatic" but are taking this case on its facts, as the government and the defendant developed those facts at trial. That, we believe, is what the Supreme Court meant when it said in *Puckett v. United States* that "the fourth prong [of *Olano*] is meant to be applied on a case-specific and fact-intensive basis." 556 U.S. 129, 142 (2009). By contrast, the Dissent does seem to have an automatic approach: invoking *Olano* automatically makes every constitutional protection a matter of pure discretion, for judges to ignore if they choose.

[41] *See supra* note 31.

the law has changed on appeal.[42]  Retrial is thus allowed and warranted.  We will therefore vacate Nasir's conviction on the § 922(g) count of the indictment, and we will remand for a new trial on that charge, at the government's discretion.

## III.  CONCLUSION

The frustration of diligent prosecutors in this case is to be expected and is fully justified.  They did not know they had

---

[42] *See*, *e.g.*, *United States v. Ford*, 703 F.3d 708, 711-12 (4th Cir. 2013) (granting a new trial where "the evidence presented at trial has been rendered insufficient only by a post-trial change in law … [and] was therefore akin to a reversal for trial error, [so] retrial did not run afoul of the Double Jeopardy Clause." (internal quotation marks and citations omitted)); *United States v. Wacker*, 72 F.3d 1453, 1465 (10th Cir. 1995) ("Moreover, the government here cannot be held responsible for 'failing to muster' evidence sufficient to satisfy a standard which did not exist at the time of trial." (citation omitted)); *United States v. Weems*, 49 F.3d 528, 531 (9th Cir. 1995) (holding that "double jeopardy protections do not bar retrial" when "[t]he government had no reason to introduce such evidence because, at the time of trial, under the law of our circuit, the government was not required to prove" that element); *see also Rehaif*, 139 S. Ct. at 2201 (Alito, J., dissenting) (noting that, following the majority's decision, "[a] great many convictions will be subject to challenge, threatening the release or retrial of dangerous individuals whose cases fall outside the bounds of harmless-error review.").

to, and hence did not, present evidence to the jury to prove that the defendant knew he was a felon when he possessed a firearm. Likewise, the burden on the busy District Court is regrettable, since it too was operating on the then-widely shared understanding of the elements of a § 922(g) offense. Nevertheless, "[t]he prosecution's failure to prove an essential element of the charged offense [is] plain error [and]… a miscarriage of justice." *United States v. Castro*, 704 F.3d 125, 138 (3d Cir. 2013) (citations omitted).

In sum, we will affirm Nasir's conviction under the crack house statute and for possession with intent to distribute marijuana. We will vacate his sentence, as it was based on the application of the career offender enhancement that we have here concluded should not be applied, and we will vacate his conviction as a felon in possession of a firearm. Accordingly, we will remand for a new trial on that charge and for resentencing.

BIBAS, *Circuit Judge*, concurring in part.

Judges interpret the law. That applies to the U.S. Sentencing Guidelines too. If the Sentencing Commission's commentary sweeps more broadly than the plain language of the guideline it interprets, we must not reflexively defer. The judge's lodestar must remain the law's text, not what the Commission says about that text.

So too here. The plain text of the Guidelines' career-offender enhancement does not include inchoate crimes. The commentary says that it does. The majority rightly rejects this extra-textual invitation to expand a serious sentencing enhancement, and I join Part II.D of its opinion.

But the narrow scope of today's holding hints at a broader problem. For decades, we and every other circuit have followed the Supreme Court's guidance in *Stinson*. That meant we gave nearly dispositive weight to the Sentencing Commission's commentary, not the Guidelines' plain text. 508 U.S. at 44–46; *see also, e.g.*, *United States v. Keller*, 666 F.3d 103, 108–09 (3d Cir. 2011); *United States v. Boggi*, 74 F.3d 470, 474–75 (3d Cir. 1996).

Now the winds have changed. In *Kisor*, the Supreme Court awoke us from our slumber of reflexive deference: agency interpretations might merit deference, but only when the text of a regulation is truly ambiguous. Before deferring, we must first exhaust our traditional tools of statutory construction. Anything less is too narrow a view of the judicial role.

We must look at things afresh. Old precedents that turned to the commentary rather than the text no longer hold. *See*

1

*Hassen v. Gov't of the V.I.*, 861 F.3d 108, 114 n.5 (3d Cir. 2017) (noting that we may revisit our precedents when they conflict with intervening Supreme Court precedent). Tools of statutory interpretation have thus been thrust to the fore. And one tool among many stands out as well suited to the task: the rule of lenity. As we rework our Sentencing Guidelines cases, lenity is the tool for the job.

## I. THE RULE OF LENITY'S VIRTUES

As Chief Justice Marshall explained, the rule of lenity is venerable. "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820). It first arose to mitigate draconian sentences. As English statutes kept expanding the death penalty and curtailing mercy, courts tempered them by construing them narrowly. Livingston Hall, *Strict or Liberal Construction of Penal Statutes*, 48 Harv. L. Rev. 748, 749–51 (1935). The canon was well established by the time of Blackstone. 1 William Blackstone, *Commentaries* *88. And it took root in our law soon thereafter. *Wiltberger*, 18 U.S. (5 Wheat.) at 95.

Under the rule of lenity, courts must construe penal laws strictly and resolve ambiguities in favor of the defendant. *See, e.g.*, *Liparota v. United States*, 471 U.S. 419, 427 (1985); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 296 (2012). The touchstone is the text: the "ordinary," evidently intended meaning of "the words of the statute." *Wiltberger*, 18 U.S. (5 Wheat.) at 95.

The rule of lenity serves three core values of the Republic. First, it is entwined with notice and thus due process. *See McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.); *United States v. R.L.C.*, 503 U.S. 291, 309 (1992) (Scalia, J., concurring). It gives citizens fair warning of what conduct is illegal, ensuring that ambiguous statutes do not reach beyond their clear scope.

Second is the separation of powers. As Chief Justice Marshall explained, the rule of lenity stems from "the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *Wiltberger*, 18 U.S. (5 Wheat.) at 95. If Congress wants to criminalize certain conduct or set certain penalties, it must do so clearly.

And third but perhaps most importantly, the rule of lenity serves our nation's strong preference for liberty. As Judge Henry Friendly explained, lenity expresses our "instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, *in* Benchmarks 196, 209 (1967). That approach fits with one of the core purposes of our Constitution, to "secure the Blessings of Liberty" for all citizens. U.S. Const. pmbl. Penal laws pose the most severe threats to life and liberty, as the Government seeks to brand people as criminals and lock them away. To guard against those threats, the rule of lenity favors respect for individual rights. *Wiltberger*, 18 U.S. (5 Wheat.) at 95. Together with the Double Jeopardy and Cruel and Unusual Punishments Clauses,

lenity is a longstanding safeguard against excessive punishment. John F. Stinneford, *Dividing Crime, Multiplying Punishments*, 48 U.C. Davis L. Rev. 1955, 1982–2001 (2015).

## II. LENITY, SENTENCING, AND *KISOR*

An agency's reading of its own regulation used to be almost dispositive. That applied equally to the U.S. Sentencing Commission and its commentary. *Stinson*, 508 U.S. at 44–46. But no more. Now, before a court defers to an agency interpretation, first it "must exhaust all the 'traditional tools' of construction." *Kisor*, 139 S. Ct. at 2415 (quoting *Chevron USA Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984)). "[O]nly when that legal toolkit is empty and the interpretive question still has no single right answer" may we give *Auer* deference to an agency's reading of its own rule. *Id.*; *see Auer v. Robbins*, 519 U.S. 452, 461 (1997).

A key tool in that judicial toolkit is the rule of lenity. Rather than defer to the commentary, we should use lenity to interpret ambiguous Guidelines. Even though the Guidelines are advisory, they exert a law-like gravitational pull on sentences. *See United States v. Booker*, 543 U.S. 220, 265 (2005) (Breyer, J., remedial majority opinion); *Peugh v. United States*, 569 U.S. 530, 543–44 (2013); U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics* 8 (reporting that last year, 75% of offenders received sentences that were either within the Guidelines range or justified by a Guidelines ground for departure). So courts must still attend to the rule and its animating principles.

Lenity's third, key purpose applies here. True, one can debate the relevance of its first two purposes: whether the commentary gives enough notice and whether congressional approval of guidelines with their commentary respects the separation of powers. *Compare Mistretta v. United States*, 488 U.S. 361, 380–411 (1989), *with id.* at 422–27 (Scalia, J., dissenting). But in any event, the presumption of liberty remains crucial to guarding against overpunishment. When a guideline is ambiguous, the rule of lenity calls for adopting the more lenient of two plausible readings. It helps ensure that "criminal punishment … represents the moral condemnation of the community." *United States v. Bass*, 404 U.S. 336, 348 (1971).

There is no compelling reason to defer to a Guidelines comment that is harsher than the text. Whatever the virtues of giving experts flexibility to adapt rules to changing circumstances in civil cases, in criminal justice those virtues cannot outweigh life and liberty. Efficiency and expertise do not trump justice. Though expertise improves things for the future, sentencing requires justice tethered to the past. The rule of lenity takes precedence as a shield against excessive punishment and stigma.

That does not mean that lenity displaces all commentary. Only when a comment to an otherwise ambiguous guideline has a clear tilt toward harshness will lenity tame it. Some provisions may have no consistent tilt across all defendants. If so, *Auer* deference might still apply.

Here, however, the guideline's plain text does not include inchoate offenses. The commentary says it does, making it harsher. So we rightly refuse to defer.

\* \* \* \* \*

Courts play a vital role in safeguarding liberty and checking punishment. That includes reading the Sentencing Guidelines. Some provisions are ambiguous. But as *Kisor* teaches, instead of deferring to the commentary the moment ambiguity arises, judges must first exhaust our legal toolkit. This will require work; our old precedents relying strictly on the commentary no longer bind. In undertaking this task, we must not forget the rule of lenity.

MATEY, *Circuit Judge*, concurring.

I concur in the majority opinion in full and write separately as to Part II.E.

Start with this question: how many people serving on a jury in the United States know exactly what it means to be "a felon?" Most, we can guess, know that a felon has run into some trouble with the law. Others, that the person has been convicted of a crime. A particularly serious crime, at least some might say. But how many of the twelve would know the precise definition used by Congress in 18 U.S.C. § 922(g)(1), someone "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year"? No matter, of course. The government will explain it all as it proves the elements of § 922(g). And along the way, a few jurors will be surprised to learn that a felony is a very particular kind of crime. That despite countless depictions in culture, both popular and timeless, a "felon" is not just a "villain." *See, e.g.*, Felon, Webster's Third New International Dictionary 836 (1993).

Now ask a harder question: if at least some of those jurors need the arguments of a lawyer to get to the right meaning of "felon," then will they all, unanimously and inevitably, conclude that the defendant knew it, too? Perhaps the government's evidence does not add up. Recollections fade, records fail to materialize, witnesses flounder. Might not the defendant's attorney find a chance to sow doubt?

Then, end with the most challenging question: what if those jurors never heard any evidence that the defendant knew he met the exacting definition of "felon" in § 922(g)? That is

1

the issue before us today, an issue that has in recent years appeared throughout the federal courts. And I believe it requires us to properly frame the question presented. On the one hand, we can view the issue as whether the fourth prong of *Olano*'s standard of review for plain error should allow an appellate court to "look outside the record" to find proof of guilt that would affirm an otherwise invalid conviction. On the other hand, we can ask whether the Sixth Amendment as originally understood includes an exception to the guarantee that an impartial jury determines a defendant's guilt. An exception that allows appellate courts to independently find an element of an offense proven beyond a reasonable doubt, using proof never presented to the jury.

It is an important distinction because when confronted with a novel question of constitutional law, that is, one not directly controlled by precedent, we should ask if the original understanding of the Constitution tolerates a certain result. No court, it appears, has considered whether the Sixth Amendment, as originally understood, allows judges to make a factual determination on an unproven element of an offense by considering documents outside the evidentiary record. Applying *that* test, I have sufficient doubt that the scope of judicial authority imagined by the Framers reaches past the horizon of the Sixth Amendment's guarantee. And I do not read *Olano*, as best understood in light of the history of the plain error doctrine, to allow for a result contrary to the original understanding of the Sixth Amendment. For those reasons, as I explain below, I concur.[1]

---

[1] This distinction—whether precedent already answers the question—accounts for the outcome in *United States v.*

## I. THE SIXTH AMENDMENT

**A.    The Original Understanding of the Right to a Jury Trial**

"Only a jury, acting on proof beyond a reasonable doubt, may take a person's liberty. That promise stands as one of the Constitution's most vital protections against arbitrary government." *United States v. Haymond*, 139 S. Ct. 2369, 2373 (2019). Ever distrustful of authority, the first generation of Americans skeptically—and belatedly—agreed to sturdier national power as long as certain stipulations bound their new government. Among them, the guarantee that criminal guilt is determined only by an "impartial jury." U.S. Const. amend. VI. Hardly an American innovation, this "ancient rule," *Haymond*, 139 S. Ct. at 2376, between free persons and their governments has "extend[ed] down centuries," *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000).[2] Indeed, "[a]s Blackstone explained, no

*Jabateh*, where the panel held that prior decisions precluded application of the plain error rule. *See* 974 F.3d 281, 298–300 (3d Cir. 2020).

[2] For examples of this history, begin with the outrages that drove the Stamp Act Congress of 1765 to pronounce that "trial by jury is the inherent and invaluable right of every British subject in these colonies." Resolutions of the Stamp Act Congress § 7 (1765) *reprinted in* Select Charters and Other Documents Illustrative of American History 1606–1775, 315 (William McDonald ed., 1906); *see also* "To Benjamin Franklin from Charles Thomson, Sept. 24, 1765," *Founders Online*, National Archives, https://founders .archives.gov/documents/Franklin/01-12-02-0149 ("It is not

3

property only we contend for. Our Liberty and most essential privileges are struck at: Arbitrary courts are set over us, and trials by juries taken away."); *and see* "To Benjamin Franklin from Thomas Wharton, June 24, 1765," *Founders Online*, National Archives, https://founders.archives.gov/documents /Franklin/01-12-02-0091 (objecting to a single judge deciding what was "heretofore only to be Assertained by a trial by Jury; and thereby depriving Us, of one of the most Essential priviledges of An Englishman."). This "essential privilege" enjoyed by the colonists "by the immutable laws of nature" included entitlement "to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." Declaration and Resolves of the First Continental Congress Resolution 5 (1774), available at https://avalon.law .yale.edu/18thcentury/resolves.asp; *see also* Declaration and Resolves of the First Continental Congress (noting that Britain passed "several acts" which "deprive the American subject of trial by jury" and "deprive[] the American subject of a constitutional trial by jury of the vicinage"). As the evidence for independence mounted, the right to jury trial emerged as profound motivation for the colonies to join in revolt. "IV. The Declaration as Adopted by Congress, [6 July 1775]," *Founders Online*, National Archives, https://founders.archives.gov /documents/Jefferson/01-01-02-0113-0005 ("Statutes have been passed . . . for depriving us of the accustomed and inestimable Privilege of Trial by Jury in Cases affecting both Life and Property"). It would become a cornerstone of a "new Government," one of the foundational principles "most likely to effect . . . Safety and Happiness." The Declaration of

4

Independence ¶ 1, 19 (1776) ("For depriving us in many cases, of the benefits of Trial by Jury").

With freedom won, the future of the right to trial by jury became a central cause for supporters and opponents of the Constitution. Writing as *Phocion* to persuade New York to ratify, Alexander Hamilton urged, "Let us not forget that the constitution declares that trial by jury in all cases in which it has been formerly used, should remain inviolate forever[]." Second Letter from Phocion, [Apr. 1784], *Founders Online*, National Archives, https://founders.archives.gov/documents /Hamilton/01-03-02-0347. Fearing a loss of the jury stirred Anti-Federalist Patrick Henry to exclaim: "Why do we love this trial by jury? Because it prevents the hand of oppression cutting you off." 3 Debates on the Adoption of the Federal Constitution 545 (Philadelphia, Jonathan Elliot ed., 1836) (1787) (statement of Patrick Henry)); *see also* Nathaniel Breading, Edmund Randolph, and Samuel Bryan, Observations on the Proposed Constitution for the United States of America 23, 1788 ("We abhor the idea of losing the transcendent privilege of trial by jury."). Indeed, "[t]he friends and adversaries of the plan of the Convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them it consists in this: the former regard it as a valuable safeguard to liberty; the latter represent it as the very palladium of free government." Alexander Hamilton, The Federalist No. 83. And so the Anti-Federalists campaigned vigorously to formally recognize the right to jury trial as "essential in every free country, that common people should have a part and share of influence, in the judicial as well as in the legislative department." Letters From The Federal Farmer (IV), in 2 The

person could be found guilty of a serious crime unless 'the truth of every accusation . . . should . . . be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen, and superior to all suspicion.'" *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020) (citing 4 W. Blackstone, Commentaries on the Laws of England *343 (1769)). And so the Constitution's jury trial guarantee "reflect[s] a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968). It is a belief that Blackstone called "the grand bulwark of . . . libert[y]." 4 W. Blackstone, Commentaries *349.

The Sixth Amendment provides, "as its most important element, the right to have the jury, rather than the judge, reach

---

Complete Anti-Federalist 249 (Herbert J. Storing ed., 1981); *see also* Letters From The Federal Farmer (XV), in 2 The Complete Anti-Federalist 320 (Herbert J. Storing ed., 1981) ("Juries are constantly and frequently drawn from the body of the people, and freemen of the country; and by holding the jury's right to return a general verdict in all cases sacred, we secure to the people at large, their just and rightful controul in the judicial department."). As summed up by Thomas Jefferson, "[a]nother apprehension is that a majority cannot be induced to adopt the trial by jury; and I consider that as the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution." "From Thomas Jefferson to Thomas Paine, 11 July 1789," *Founders Online*, National Archives, https://founders.archives.gov/documents/Jefferson/01-15-02-0259.

the requisite finding of 'guilty.'" *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993) (citing *Sparf v. United States,* 156 U.S. 51, 105–06 (1895)). From this flows the "unmistakable" condition that a "jury must reach a unanimous verdict in order to convict." *See Ramos*, 140 S. Ct. at 1395. And for a jury to be unanimous, the Fifth Amendment requires a unanimous finding of guilt on "all elements" of the charged offense. *Sullivan*, 508 U.S. at 277–78. "Together, these pillars of the Bill of Rights," *Haymond*, 139 S. Ct. at 2376, ensure that "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of *every element* of the crime with which he is charged." *United States v. Gaudin*, 515 U.S. 506, 522–23 (1995) (emphasis added). It is, in short, a bedrock precept that remains unmoved by the perpetual current that otherwise defines our Republic.

## B. Judicial Interpretations of the Jury Trial Right

As Justice Scalia so aptly analogized, "[w]hen this Court deals with the content of th[e] [right to jury] guarantee— the only one to appear in both the body of the Constitution and the Bill of Rights—it is operating upon the spinal column of American democracy." *Neder v. United States*, 527 U.S. 1, 30 (1999) (Scalia, J., concurring in part and dissenting in part). Indeed, "together with the right to vote, those who wrote our Constitution considered the right to trial by jury 'the heart and lungs' . . . of our liberties, without which 'the body must die.'" *Haymond*, 139 S. Ct. at 2375 (quoting Letter from Clarendon to W. Pym (Jan. 27, 1766), in 1 Papers of John Adams 169 (R. Taylor ed. 1977)). Complex surgery on one part of the body, however, can throw another part out of alignment. Similar consequences often follow judicial interpretations of our constitutional guarantees. For instance, consider a defendant

7

on trial for murder. The jury finds him not guilty. But the prosecution remains convinced the jury got it wrong. It brought forth a mountain of evidence that proved guilt beyond a reasonable doubt and wants to appeal. Unlike a group of laypersons, a panel of jurists, far more learned and wiser, will unquestionably find for the prosecution. Can the government appeal? Of course not, any first-year law student will answer, because of the Double Jeopardy Clause of the Fifth Amendment.

Now suppose the defendant is tried for first-degree murder. The defendant acknowledges he is the killer, but the jury finds that he did not act with malice aforethought, and returns a not guilty verdict. Wait, argues the government, all the elements for an uncharged lesser crime are found in the record. So the prosecution appeals and asks those same wise judges to simply find the defendant guilty of another crime. No again, answers the student. Or perhaps the jury just can't decide one way or another. Nine say that he definitely did it; three say that there's no way. Like a low inside curve, can a judge make the call that decides the matter? No, because the jury verdict must be unanimous, a point recently steadied by the Supreme Court. *Ramos*, 140 S. Ct. at 1395.

What about a defendant acquitted over an "erroneous *addition* of a statutory element"? *Evans v. Michigan*, 568 U.S. 313, 316 (2013) (emphasis added). Can the government appeal? No, because "our cases have defined an acquittal to encompass any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense," even if that purported insufficiency turns on an extraneous element of the offense. *Id.* at 318. Indeed, an acquittal must stand even if "predicated upon a clear misunderstanding of what facts the

8

[prosecution] needed to prove under [governing] law," without regard to "whether the court's decision flowed from an incorrect antecedent ruling of law," and even when "the product of an erroneous interpretation of governing legal principles." *Id.* at 320 (internal quotation marks omitted).

Try another: suppose after the defendant is convicted it becomes clear that the prosecution charged and proved *less than* every essential element of the offense. No problem, says the government, *most* of the elements were proven. And a guilty verdict that "omits an element of the offense," the Supreme Court has concluded, "does not *necessarily* render a criminal trial fundamentally unfair." *Neder*, 527 U.S. at 9. After all, it would be awfully burdensome to retry the case just to prove what everyone seemingly already knows.

But this time, the government notes, there's a catch: there is no evidence in the record that could prove the missing element. There is other reliable proof, however, outside the trial record that establishes the unproven portion of the crime.[3] Can a court consider this material—information everyone agrees the jury never saw—and then find the defendant guilty beyond a reasonable doubt? Well, the answer is complex. In the past, tests have weighed cardinal constitutional guarantees against judicial efficiency and the chance of success on retrial. *See id.* at 15 ("We do not think the Sixth Amendment requires

---

[3] Perhaps, for example, the evidence was suppressed. Or the parties stipulated to bar its introduction. Maybe the prosecution did not choose to offer the evidence. Maybe none of the parties, or the court, thought the evidence was relevant. Whatever the reason, the result is the same: the jury never saw it.

9

us to veer away from settled precedent" to grant "[r]eversal without any consideration of the effect of the error upon the verdict[.]"). More recently, the Supreme Court recoiled at even the suggestion of such a balancing test. *See Ramos*, 140 S. Ct. at 1402 ("When the American people chose to enshrine [the Sixth Amendment] in the Constitution, they weren't suggesting fruitful topics for future cost-benefit analysis."). All of which brings us to Malik Nasir.

## II. THE DOCTRINE OF PLAIN ERROR REVIEW

There is no disagreement about the road leading to this case. In *Rehaif v. United States*, the Supreme Court held "that the Government must prove that a defendant charged with violating [18 U.S.C.] § 922(g) knew both that he possessed a firearm and that he belonged to the relevant class of persons barred from possessing a firearm." *In re Sampson*, 954 F.3d 159, 161 (3d Cir. 2019) (per curiam) (citing *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019)). But Nasir's indictment did not allege,[4] and the Government did not prove, that Nasir knew about his prohibited status.[5] Those errors are

---

[4] Count Three of the indictment charged that Nasir "did knowingly possess in and affecting interstate and foreign commerce, firearms . . . after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in the United States District Court for the Eastern District of Virginia, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2)." (App. at 40–41.)

[5] The District Court instructed the jury that "in order to find the defendant guilty of [18 U.S.C. § 922(g)], you must find that the government proved each of the following three

unsurprising since, before *Rehaif*, "every single Court of Appeals" relied on the same "long-established interpretation" attributed to 18 U.S.C.§ 922(g) "in thousands of cases for more than 30 years." *Rehaif*, 139 S. Ct. at 2201 (Alito, J., dissenting). But it was still erroneous and, since *Rehaif* arrived while Nasir's direct appeal remained pending, "we apply [*Rehaif*] retroactively." *Johnson v. United States*, 520 U.S. 461, 467 (1997). That, one might assume, is the end of the story. Since the jury did not decide a necessary element of § 922(g), Nasir could not have received the guarantees of the Fifth and Sixth Amendments as originally understood. *See Sullivan*, 508 U.S. at 277–78. Not so, owing to the ever-expanding discretion afforded courts under the plain error doctrine. *See, e.g.*, *United States v. Maez*, 960 F.3d 949, 956 (7th Cir. 2020) (explaining that under *Johnson*, courts are to apply plain-error review to changes in constitutional law after conviction).[6]

---

elements beyond a reasonable doubt: First, that the defendant has been convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year; Second, that after this conviction, the defendant knowingly possessed the firearm described in Count Three of the Indictment; and Third, that the defendant's possession was in or affecting interstate or foreign commerce." (App. at 615–16.)

[6] *But see Rehaif*, 139 S. Ct. at 2201, 2213 (Alito, J., dissenting) ("A great many convictions will be subject to challenge, threatening the release or retrial of dangerous individuals whose cases fall outside the bounds of *harmless-error review*," and "[t]hose for whom direct review has not ended will likely be entitled to a new trial." (emphasis added)).

## A.      The Original Understanding of Plain Error Review

The current authority of a federal appellate court to notice unpreserved error grew from the early practices of the Supreme Court. By the late nineteenth century, the Court's general rule confining review "to a discussion of the errors stated" still permitted the Court, "at its discretion, [to] notice any other errors appearing in the record." 78 U.S. (11 Wall.) x (1871) (adopting Sup. Ct. R. 21 (amended 81 U.S. (14 Wall.) xi, xii (1872), repealed 1939)). In 1874, the Court cabined that discretion and coined the now familiar "plain error" doctrine. *See* Sup. Ct. R. 21 § 8, 16 (1874) ("Without such an assignment of errors, counsel will not be heard, except at the request of the court, and errors not assigned according to this rule will be disregarded, though the court, at its option, may notice a plain error not assigned."); *see O'Neil v. Vermont*, 144 U.S. 323, 365 (1892) (Field, J., dissenting) (explaining "[t]he right of the court to consider [an] alleged error of its own motion is within its authority under the [plain error] rule"). As Justice Field explained, the plain error rule focused on mistakes "affecting the liberty of the citizen." *Id.* at 360.

Using that authority, the Court applied the plain error rule to invalidate a constitutionally infirm conviction. *Wiborg v. United States*, 163 U.S. 632, 658 (1896). In *Wiborg*, the Court spoke of the judicial "liberty" to review questions "not properly raised" if "a plain error was committed in a matter so absolutely vital to defendants." *Id*. The Court reaffirmed that perspective in *Clyatt v. United States*, holding that *Wiborg* "justifies us in examining the question in case a plain error has been committed in a matter so vital to the defendant." 197 U.S. 207, 221–22 (1905). *See also Crawford v. United States*, 212

12

U.S. 183, 194 (1909) ("[Courts] will, in the exercise of a sound discretion, sometimes notice error in the trial of a criminal case, although the question was not properly raised at the trial by objection and exception."); *Brasfield v. United States*, 272 U.S. 448, 450 (1926) ("[F]ailure of petitioners' counsel to particularize an exception to the court's inquiry does not preclude this Court from correcting the error."). And this focus on issues "vital" to the defendant flows directly from the guarantees of the Constitution. Those commitments make the plain error rule "not a rigid one," and courts have had "less reluctance to act under it when rights are asserted which are of such high character as to find expression and sanction in the Constitution or Bill of Rights." *Weems v. United States*, 217 U.S. 349, 362 (1910). The plain error rule, as first applied by the Supreme Court, recognizes "[t]he right of trial by Jury is a fundamental law, made sacred by the Constitution," and enjoyed by all persons before the Founding. *Vanhorne's Lessee v. Dorrance*, 2 Dall. 304, 309 (Patterson, Circuit Justice, C.C.D.Pa.1795) (discussing the language of the 1790 Constitution of the Commonwealth of Pennsylvania mirroring the Sixth Amendment). Jury trials are a firewall against a process that would devalue natural rights, unsuitable for sacrifice on the altar of efficiency.

But though conceived as a reminder of the highest principles of ordered liberty, the plain error doctrine pivoted in *United States v. Atkinson*, 297 U.S. 157 (1936). Departing from its prior focus on "vital" errors impacting foundational rights, *Atkinson* turned to concerns about the integrity of judicial proceedings. This new theory of plain error produced an oft-cited principle: "In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been

13

taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 160.

## B.     The Text of Rule 52(b)

The turn did not take. Rule 52(b) codified the plain error doctrine in 1944, choosing fundamental rights over structural anxieties by shedding the baggage of *Atkinson* in favor of a straightforward definition: "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b). It is, of course, "the text of the Rule that controls." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 557 (2010) (Scalia, J., concurring in part). Rule 52(b) limits the power to notice unpreserved errors to only those affecting "substantial rights." That language traces straight back to *Wiborg*. *See, e.g.*, *Storgard v. France & Canada S.S. Corp.*, 263 F. 545, 546 (2d Cir. 1920) ("[A]ppellate courts may consider plain errors, not excepted to nor assigned, though this is rarely done except in criminal cases" that impact "substantial rights.") (citing *Oppenheim v. United States*, 241 F. 625, 628 (2d Cir. 1917) (citing *Wiborg* and *Crawford*)); *McCormick v. United States*, 9 F.2d 237, 240 (8th Cir. 1925) ("The substantial rights of defendants in criminal cases have always been amply protected. . . . [W]here plain error has been committed in a matter vital to defendants, . . . it is considered.") (citing *Wiborg*). Against that backdrop, there is little reason to conclude that Rule 52(b) disregarded the traditional meaning of the plain error rule. *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 318 (2012) (explaining the canon of interpretation that "statutes will not be interpreted as changing the common law unless they effect

14

the change with clarity"). And while "not authoritative," *Black v. United States*, 561 U.S. 465, 475 (2010) (Scalia, J., concurring in part and concurring in the judgment), the commentary provided by the Advisory Committee confirms that is the best reading of the rule. *See* Fed. R. Crim. P. 52 advisory committee's note to subsection (b) ("Th[e] [plain error] rule is a restatement of existing law[.]") (citing *Wiborg*, 163 U.S. at 658); *see also Krupski*, 560 U.S. at 557 (Scalia, J., concurring in part and concurring in the judgment) ("The Advisory Committee's insights into the proper interpretation of a Rule's text are useful to the same extent as any scholarly commentary.").

## C.     The *Olano* Framework

Despite all of this, the Court would later state that "the 'standard laid down in *United States v. Atkinson* [was] codified in [Rule] 52(b).'" *United States v. Olano*, 507 U.S. 725, 736 (1993). *Olano* provides a four-pronged inquiry that remains our standard today. Courts may provide remedies under Rule 52(b) only if (1) there is an "error[,]" (2) the error is "plain[,]" and (3) the plain error "affect[s] substantial rights." *Id*. at 732–34; *see also Johnson*, 520 U.S. at 466–67 (1997). Satisfying all three prongs creates discretion to (4) "correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736 (citing *Atkinson*, 297 U.S. at 160). So now, "a plain error affecting substantial rights does not, without more, satisfy the *Atkinson* standard, for otherwise the discretion afforded by Rule 52(b) would be illusory." *Id*. at 736–37.

15

Recent applications of Rule 52(b) have focused on its discretionary character. *See Johnson*, 520 U.S. at 469–70 ("When the first three parts of *Olano* are satisfied, an appellate court must then determine whether the forfeited error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings' before it may exercise its discretion to correct the error.") (citing *Olano*, 507 U.S. at 736). These cases make clear that any "*per se* approach to plain-error review is flawed," *United States v. Young*, 470 U.S. 1, 16 n.14 (1985), because "[t]he fourth prong is meant to be applied on a case-specific and fact-intensive basis." *Puckett v. United States*, 556 U.S. 129, 142 (2009). That, of course, is nothing new, as the original application of plain error always assumed searching scrutiny. *See Weems*, 217 U.S. at 362; *Crawford*, 212 U.S. at 194; *Clyatt*, 197 U.S. at 221–22; *Wiborg*, 163 U.S. at 658. But the Court expressly tied that probing inquiry to violations of natural, substantial rights "of such high character as to find expression and sanction in the Constitution or Bill of Rights." *Weems,* 217 U.S. at 362.

That, in my view, is the best reading of *Olano*, one that harmonizes the guarantees of the Sixth Amendment and the tradition of noticing errors that, though unpreserved, uniquely threaten fundamental rights. Not one that licenses endless tradeoffs to efficiency. Rather, as the Supreme Court recently cautioned, while "[t]here *may* be instances where countervailing factors satisfy the court of appeals that the fairness, integrity, and public reputation of the proceedings will be preserved *absent* correction," we must perform a "searching" inquiry. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1909 (2018) (emphasis added). Searching should, as always, begin with the original public understanding of the right in question. Looking to that history, I conclude that

16

allowing an appellate court to find facts and inferences outside the record to rescue a conviction that all agree lacked an essential element of proof usurps the role of the jury and therefore cannot be a countervailing factor under *Olano*. Put simply, it is difficult to imagine a countervailing consideration more fundamental than the fundamental right to a trial by jury secured by the Constitution.

### III. CONTRACTING PLAIN ERROR REVIEW IS INCONSISTENT WITH HISTORY AND TRADITION

In many respects, we have already traveled far from the guarantees of the Sixth Amendment to the conclusion that failing to submit every element of a crime to the jury does not "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 469–70; *see also United States v. Cotton*, 535 U.S. 625, 632–33 (2002) ("As in *Johnson*, we need not resolve whether respondents satisfy this element of the plain-error inquiry, because even assuming respondents' substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings.") (citation omitted); *Neder*, 527 U.S. at 9 ("[A]n instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."). Now, even under harmless-error review, an appellate court is free to step into the role of the jury and peruse the record for facts supporting the missing element of a crime. *Id.* at 17. At least, the court may step in for now, so long as those facts are "overwhelming," "uncontroverted," and "[o]n [the] record." *Johnson*, 520 U.S. at 470 (internal quotation marks omitted); *see also Neder*, 520 U.S. at 16–17 (upholding conviction relying on "overwhelming record evidence"); *Cotton*, 535 U.S.

17

at 633 (finding no plain error where record evidence was "overwhelming" and "essentially uncontroverted"). So while "we do not know . . . *how many* elements can be taken away from the jury with impunity, so long as appellate judges are persuaded that the defendant is surely guilty," we know we would be free to affirm Nasir's conviction looking solely to evidence in the record. *Neder*, 527 U.S. at 33 (Scalia, J., concurring in part and dissenting in part).

But we have no such evidence to reach for. To uphold Nasir's conviction, we must supplement the evidentiary record with information never presented to the jury. "The most [we] can conclude is that a jury *would surely have found* petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error." *Sullivan*, 508 U.S. at 280. I am doubtful that the Sixth Amendment was first understood to provide courts the power "to hypothesize a guilty verdict that was never in fact rendered." *Id*. at 279. Some might find it tempting to glance outside the record for proof, perhaps even compelling proof, that Nasir knew he was a felon. But that is just the sort of temptation that informed a "healthy suspicion" of government power and drove the demand for written confirmation of our most sacred rights. *Neder*, 527 U.S. at 32 (Scalia, J., concurring in part and dissenting in part); *see also* 3 J. Story, Commentaries on the Constitution of the United States § 1774, at 653 (1833) ("[Protection] against a spirit of oppression and tyranny on the part of rulers, and against a spirit of violence and vindictiveness on the part of the people" demands "the severe control of courts of justice, and by the firm and impartial verdict of a jury sworn to do right and guided solely by legal evidence and a sense of duty. In such a course there is a double security against the prejudices of

18

judges, who may partake of the wishes and opinions of the government, and against the passions of the multitude, who may demand their victim with a clamorous precipitancy."); *cf. Duncan*, 391 U.S. at 160 ("So-called petty offenses were tried without juries both in England and in the Colonies and have always been held to be exempt from the otherwise comprehensive language of the Sixth Amendment's jury trial provisions. There is no substantial evidence that the Framers intended to depart from this established common-law practice.").

This history is reason alone to decline a fresh contraction of the plain error doctrine. The theory of plain error review exists, as must all laws, as a validation of our natural and fundamental rights. It is best imagined as a shield against arbitrary expansions of government, not a sword of efficiency striking at the very impediments to easier oppression demanded by the Framers, Ratifiers, and People. Failing to notice error here would necessarily contravene the original understanding of the Sixth Amendment and, therefore, necessarily flout the rule of *Olano* prohibiting courts to ignore errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736.

Many courts have held differently. Some say it is of no moment that the government did not prove knowledge because it is obvious the defendant knew he was a felon. Reliable records tell us so, they say, and disregarding what a jury did not see would jeopardize the fairness, integrity, and reputation of the proceedings. *See, e.g.*, *United States v. Miller*, 954 F.3d 551, 558 (2d Cir. 2020). Others conclude that "because convicted felons typically know they're convicted felons," any error is "almost always harmless." *United States v. Lavalais*,

19

960 F.3d 180, 188 (5th Cir. 2020); *see also United States v. Gary*, 963 F.3d 420, 423 (4th Cir. 2020) (Wilkinson, J., concurring) ("[T]he vast majority of defendants who will seek to take advantage of a structural *Rehaif* error are perfectly aware of their felony status. Felony status is simply not the kind of thing that one forgets."). Still others find post-*Rehaif* extra-record review to be a natural evolution to reviewing documents outside the record at sentencing. *See United States v. Reed*, 941 F.3d 1018, 1021 (11th Cir. 2019) (quoting *United States v. Vonn*, 535 U.S. 55, 59 (2002)).

Perhaps. But I do not read these post-*Rehaif* cases to proceed from the common law tradition of plain error review and, as a corollary, the original understanding of the Sixth Amendment. I find no evidence that the guarantees enumerated in the Bill of Rights are measured for modern efficiency. To the contrary, our Framers expected these rights would protect us all from encroachment by the government they hesitantly accepted. That fear explains why, "[w]hen our more immediate ancestors removed to America, they brought this great privilege with them, as their birth-right and inheritance, as a part of that admirable common law, which had fenced round, and interposed barriers on every side against the approaches of arbitrary power." 3 J. Story, Commentaries on the Constitution of the United States § 1773, at 652–53 (1833); *see also Thompson v. Utah*, 170 U.S. 343, 350 (1898) ("The trial per pais, or by a jury of one's country, is justly esteemed one of the principal excellencies of our constitution; for what greater security can any person have in his life, liberty, or estate than to be sure of the being devested of nor injured in any of these without the sense and verdict of twelve honest and impartial men of his neighborhood?" (quoting Juries, 3 Matthew Bacon, A New Abridgment of the Law (1736)). Put simply: "If you're

20

charged with a crime, the Sixth Amendment guarantees you the right to a jury trial. From this, it follows that the prosecutor must prove to a jury all of the facts legally necessary to support your term of incarceration." *Hester v. United States*, 139 S. Ct. 509, 509 (2019) (Gorsuch, J., dissenting).

For that reason, I prefer the certainty of the "great rights" Madison captured in the Constitution, including "trial by jury, freedom of the press, [and] liberty of conscience." 1 Annals of Cong. 453 (1789) (Joseph Gales ed., 1834). Rather than see them eroded, I find "it is proper that every Government should be disarmed of powers which trench upon those particular rights." *Id.* at 458. While that differs from the conclusions of other courts, we should recall that "[t]hose who wrote our constitution[] knew from history and experience that it was necessary to protect against unfounded criminal charges . . . and against judges too responsive to the voice of higher authority." *Duncan*, 391 U.S. at 156.

## IV. CONCLUSION

I readily acknowledge that retrying defendants like Nasir might end up with juries returning the same verdict of guilt. But isn't that the point? Like Justice Scalia, and Blackstone long before him, I bear deep reservations about any holding that "scorn[s]" our "formal requirements . . . when they stand in the way of expediency." *Neder*, 527 U.S. at 39–40 (citing 4 W. Blackstone, Commentaries *350 ("[H]owever *convenient* [intrusions on the jury right] may appear at first, (as, doubtless, all arbitrary powers, well executed, are the most convenient,) yet let it be again remembered that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial

matters[.]"). Pillars of liberty are rarely toppled, but sanded down into forms unrecognizable to their creator. The right to be judged by impartial peers under the due process of law stands as an antagonist against such erosion, and "[s]o long . . . as this palladium remains sacred and inviolable, the liberties of a free government cannot wholly fall." 3 J. Story, *supra* § 1774, at 653 (citing 4 Blackstone Commentaries at *349–50).

For all these reasons, I conclude that "[i]n the end, the best anyone can seem to muster . . . is that, if we dared to admit in his case what we all know to be true about the Sixth Amendment, we might have to say the same in some others." *Ramos*, 140 S. Ct. at 1408 (plurality opinion). I therefore concur.

judicial proceedings. *Id.* at 1021–22. Because the defendant's presentence report "stated that he had been incarcerated for lengthy terms before possessing the firearm," *id.* at 1020, he could not prove that the error affected "the fairness, integrity, or public reputation of his trial," *id.* at 1022. Accordingly, the Eleventh Circuit declined to set aside his conviction. *Id.* at 1022.

The majority chides the Eleventh Circuit for relying on *United States v. Vonn*, 535 U.S. 55 (2002), and concluding that a court need not confine itself to the trial record at prong four, because *Vonn* involved review of a guilty plea rather than a conviction after a jury trial. Maj. Op. 39–40. But the majority ignores the Eleventh Circuit's discussion of *United States v. Young. See Reed*, 941 F.3d at 1021. In *Young*, the Supreme Court denied plain-error relief where a prosecutor made improper comments during rebuttal because the remarks were made in response to defense counsel's own improper remarks during summation and "were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." 470 U.S. at 16–19. The Court explained that it could not "properly evaluate [the defendant's claims of error] except by viewing [them] *against the entire record*," *id.* at 16 (emphasis added), because Rule 52(b) "authorizes the Courts of Appeals to correct only 'particularly egregious errors,'" *id.* at 15 (quoting *Frady*, 456 U.S. at 163).

The Supreme Court has never held that the "entire record" that *Young* instructs us to examine means just the trial record.[8] That would make no sense: reasonable people will

---

[8] In *Makiel v. Butler*, 782 F.3d 882 (7th Cir. 2015), the Seventh Circuit discussed the difference between the "entire record" and the "trial record" in a case involving the materiality

18

consider all relevant information in assessing whether our decision to affirm Nasir's conviction works a miscarriage of justice that is inconsistent with fairness, integrity, and the good reputation of our judicial system. And unlike the majority, they will not arbitrarily ignore the indisputable fact of Nasir's scienter and guilt. Maj. Op. 59–64. In deciding whether to exercise our discretion, we should consider reliable materials within and outside of the trial record just as thoughtful members of the public certainly will.[9]

---

standard of the Compulsory Process Clause. *Id.* at 908–10. Although *Makiel* was not a plain-error case, the court's discussion assists our consideration of the scope of discretionary review prescribed by *Olano*. Similar to our task at prong four, the court in *Makiel* had to evaluate the defendant's argument in light of public interests such as "the integrity of the adversary process, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." *Id.* at 909. The Seventh Circuit concluded that when the Supreme Court instructs circuit courts to evaluate claims of trial error in the context of the "entire record," that is broader than the "trial record." *Id.*

[9] Consider the prong-four significance of Nasir's *Old Chief* stipulation, which of course *was* part of the trial record. The majority suggests that it could never be even circumstantial evidence of his scienter, Maj. Op. 55–57, but that assertion is not compelled by *Rehaif*. And it wars against common sense and experience. As a strictly logical proposition, it is true that Nasir's stipulation proved only that he knew of his felon status as of the date of the stipulation; it did not *necessarily* prove that he knew he was a felon when he was arrested with the gun. But just as a factual statement can be strictly true and yet fraudulent

19

The majority also assails the Second Circuit's decision in *Miller* and the Seventh Circuit's decision in *Maez*. Its criticism of the approach taken by those two circuits is similarly unpersuasive.

*Miller* involved a defendant whose presentence investigation report showed that he spent several years in prison prior to his firearm possession, rendering it obvious that he knew he was a felon at the time of possession. 954 F.3d at 560. The Second Circuit "ha[d] no doubt that, had the *Rehaif* issue been foreseen by the district court, [the defendant] would have stipulated to knowledge of his felon status to prevent the jury from hearing evidence of his actual sentence." *Id.* at 560. So, the court concluded, the fairness, integrity, and public reputation of the judicial system would not be seriously affected by upholding the conviction; in fact, the defendant was so obviously guilty that *vacating* his conviction "would have that effect." *Id.* at 559. In *Maez*, the Seventh Circuit largely adopted the Second Circuit approach, concluding that vacating the convictions of two defendants whose presentence reports indicated that they served more than one year in prison on prior felony

because of a material omission, Nasir's stipulation does not foreclose the possibility that he also understood that he was a felon every day after his knowing and voluntary guilty pleas in 2000, 2001, and 2007. A thoughtful observer drawing upon her reason, experience, and common sense might easily infer from Nasir's June 2017 stipulation that he knew of his felon status when apprehended with a gun in December 2015. Such an inference, though not logically required, would be patently sensible to many people. And surely, many will consider his stipulation in this light when evaluating our discretionary decision whether to notice the plain error created by *Rehaif*.

convictions would negatively affect the fairness, integrity, and public reputation of judicial proceedings. 960 F.3d at 964–66.

The majority faults the Second and Seventh Circuits for "treat[ing] judicial discretion as powerful enough to override the defendant's right to put the government to its proof when it has charged him with a crime." Maj. Op. 46–47. But Nasir has not been deprived of that right. He had the opportunity to insist that the government be required to prove that he knew he was a felon at the time of his firearm possession. He did not do so, instead agreeing that no such proof need be presented. As a direct result of that choice, the government did not introduce evidence as to Nasir's knowledge of his status at the time of possession though such evidence was readily available. I do not see why Nasir's failure to object to the jury instruction and decision to instead avail himself of an *Old Chief* stipulation should continue to redound to his benefit now that we are exercising remedial discretion.

### F.    Nasir does not satisfy *Olano*'s step-four standard for error-correction

Our sister circuits' approach does not "imply that relief on plain-error review is available only to the innocent." Maj. Op. 47.[10] If, for example, an error so corrupts a judicial

---

[10] Indeed, as the Seventh Circuit recognized, "defendants can sometimes show an effect on fairness or integrity without a claim of innocence." *Maez*, 960 F.3d at 962. But "though a defendant's likelihood of actual guilt or innocence does not necessarily control the third prong of plain-error review, it may play a role at prong four." *Id.* That is because a court has "broad discretion under prong four to leave even plain errors

21

proceeding as to make its verdict completely unreliable, no court would require a defendant to prove on appeal that he was actually innocent before vacating a conviction resulting from such a proceeding. *See Medley*, 972 F.3d at 424–25 (Quattlebaum, J., dissenting) (explaining that "central" to prong-four analysis in a criminal case "is a determination of whether, based on the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt" (internal quotation marks omitted) (quoting *United States v. Ramirez-Castillo*, 748 F.3d 205, 217 (4th Cir. 2014))). That is because the Third Branch would not want to put its imprimatur on a proceeding that makes a mockery of justice and reduces the system's standing in the eyes of the public. But that is not a problem here. A simple, unobjected-to error in jury instructions, where the defendant's conviction would have been certain had an objection been made at the proper time, does not cry out for an exercise of our discretion.

Remanding this case for retrial is unnecessarily burdensome and seriously undermines the fairness and public reputation of judicial proceedings. That broad inquiry is the standard governing our exercise of discretion. The majority compounds its error by explicitly limiting our prong-four discretion to Nasir's trial, which, it insists, "is the only judicial proceeding at issue." Maj. Op. 41 n.22. Not so. At prong four we ask whether refusing to cure the plain error would "seriously affect the fairness, integrity or public reputation of judicial proceedings" *generally*, not merely the particular defendant's proceeding. *Puckett*, 556 U.S. at 135. As the Court elaborated in *Puckett*, we consider whether affirming Nasir's conviction

---

uncorrected where [it has] no doubt as to the ultimate result of further proceedings." *Id.* at 963.

would call into question "the integrity of *the system*" and be so ludicrous as to "compromise the public reputation of *judicial proceedings*." *Id.* at 142–43 (emphasis added); *see also United States v. Edgell*, 914 F.3d 281, 291 (4th Cir. 2019); *United States v. Marroquin*, 884 F.3d 302, 304 (5th Cir. 2018) (Smith, J., dissenting from denial of rehearing en banc); *United States v. Gonzalez-Huerta*, 403 F.3d 727, 739 (10th Cir. 2005) (en banc); *id.* at 742 (Ebel, J., concurring); *id.* at 747 (Hartz, J., concurring). Because the majority asks the wrong prong-four question, it refuses to consider information that would suggest the correct answer.

Even if we improperly limited our prong-four inquiry to what the majority erroneously describes as "the actual field of play – the trial," Maj. Op. 41 n.22, we should still affirm. When asked twice at oral argument how Nasir would attempt to disprove the knowledge-of-status element if the case were sent back for retrial, his counsel was unable to give a responsive answer. (That is not a criticism of counsel's performance; there is no plausible explanation.) Instead, counsel allowed that Nasir would strategically use a remand to try to negotiate a better plea deal. In light of that revelation, I believe that thoughtful members of the public would view the majority's judgment and Nasir's windfall with bemused cynicism rather than reputation-enhancing admiration.

## G. We are bound by the Supreme Court's plain-error precedent

The majority at least purports to apply *Olano* and its progeny. Judge Matey's opinion strikes out in an entirely different direction, citing first principles. I endorse that approach in cases where lower court judges write on a blank slate, but in this appeal we are guided by ample Supreme Court precedent.

23

In any event, although we have not had the benefit of original-ist briefing and argument, I doubt that Rule 52(b)'s remedial discretion as currently applied offends the Sixth Amendment and note that Justices Scalia and Thomas both joined *Olano* without any reservation, originalist or otherwise. *Cf.* Concurring Op. 13–16 (criticizing *Atkinson* and *Olano* as allegedly unwarranted expansions of original plain-error doctrine). Moreover, I fail to grasp how a purportedly originalist application of plain-error review can affirm the conviction of *non-criminal conduct* but disallows the conviction of conduct that was certainly criminal but not properly proven. *Cf. United States v. Jabateh*, 974 F.3d 281, 287 (3d Cir. 2020).

*****

The Supreme Court has disapproved "a reflexive incli-nation by appellate courts to reverse because of unpreserved error," a tendency contrary to the "strictly circumscribed" appellate-court authority to remedy unpreserved error only where necessary due to exceptional circumstances. *Puckett*, 556 U.S. at 134 (internal quotation marks omitted) (quoting *United States v. Padilla*, 415 F.3d 211, 224 (1st Cir. 2005) (Boudin, C.J., concurring)). Yet the majority persists in the face of overwhelming, reliable information supporting Nasir's conviction. Its error stems from a basic misunderstanding of the nature of plain-error review. I respectfully dissent from Section II.E of the majority opinion.

24

PORTER, *Circuit Judge*, joined by SMITH, *Chief Judge*, CHAGARES, HARDIMAN, SHWARTZ, BIBAS, and PHIPPS, *Circuit Judges*, concurring in part and dissenting in part.

I concur with Sections I and II.D of the majority opinion. But I depart from the majority's plain-error discussion in Section II.E because it is profoundly mistaken, it dismisses the collective wisdom of nearly every other circuit court, and—ironically—it derogates the fairness, integrity, and public reputation of judicial proceedings. After reviewing the entire record, I would affirm Malik Nasir's conviction rather than remand it for a pointless retrial.

## I.    ADDITIONAL BACKGROUND

### A.    Nasir pleaded guilty to felony charges on three separate occasions and actually served over seven years' imprisonment

On September 6, 2000, Nasir pleaded guilty to attempting to possess cocaine with intent to distribute. As a result of his guilty plea and felony conviction, Nasir was sentenced to seven years' imprisonment. After serving one year in prison, his sentence was suspended, and he was placed on supervised probation.

On June 21, 2001, Nasir pleaded guilty to possession of cocaine with intent to distribute. As a result of his guilty plea and felony conviction, Nasir was sentenced to ten years' and thirty days' imprisonment. After serving eighteen months in prison, his sentence was suspended and he was placed on supervised probation.

1

On June 20, 2007, Nasir pleaded guilty to possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). As a result of his guilty plea and felony conviction, Nasir was sentenced to eighty-four months' imprisonment. He actually served five and one-half years of that sentence before being released on December 14, 2012.

### B. Nasir stipulated to his prior felony conviction and did not make a scienter objection at trial

In 2015, Nasir was indicted for violating the felon-in-possession statute, together with several drug-related charges. At his 2017 trial, Nasir stipulated that he had been "convicted of a felony crime punishable by imprisonment for a term exceeding one year, in the United States District Court for the Eastern District of Virginia." S.A. 21. Although Nasir's stipulation did not specify the prior felony conviction, it was for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1)—the same crime for which he was being tried. Nasir's stipulation prevented the government from introducing evidence to prove the nature and circumstances of his prior felony conviction. *See Old Chief v. United States*, 519 U.S. 172, 174–75 (1997).

Under the law at the time of Nasir's trial, the government adduced sufficient evidence to secure a conviction under § 922(g)(1) and the district court properly instructed the jury on the elements of that crime. Nasir did not object to the district court's jury instruction or to the sufficiency of the government's evidence on the § 922(g)(1) charge. But while his appeal was pending the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019), holding that in order to secure a conviction under § 922(g), the government must prove that the defendant "knew he belonged to the relevant category of

2

persons barred from possessing a firearm." *Id.* at 2200. Nasir then supplemented his briefing by adding new arguments based on *Rehaif*.

## II. NASIR CANNOT SATISFY *OLANO* PRONG FOUR, SO HIS CONVICTION SHOULD BE AFFIRMED

### A. The purpose of plain-error review

The majority duly notes that because Nasir did not object to the sufficiency of the evidence on the knowledge-of-status element, we review for plain error. Maj. Op. 27. But the majority fails to consider the reason for plain-error review and how that reason informs our decision. Federal Rule of Criminal Procedure 52(b) exists to promote compliance with claim-presentation rules. When a defendant forfeits an issue by failing to timely object, we have discretion to correct the plain error. But that discretion is bounded by the four factors discussed in *United States v. Olano*, 507 U.S. 725, 732–36 (1993), particularly the prong-four focus on the fairness, integrity, and public reputation of judicial proceedings.

The link between forfeiture and plain-error review is relevant here because Nasir failed to raise a knowledge-of-status objection at his trial. True, the Supreme Court did not change the rule until two years later when it decided *Rehaif*. But even if a solid wall of circuit authority makes objection at trial apparently futile, Rule 52(b) applies when the source of plain error is a supervening decision. *Johnson v. United States*, 520 U.S. 461, 468 (1997). *Contra United States v. Keys*, 95 F.3d 874, 878 (9th Cir. 1996) (Rule 52(a), rather than Rule 52(b), governs appellate review of unpreserved error when defendant "faced with a solid wall of circuit authority" at trial), *vacated*, 520 U.S. 1226 (1997).

3

Contrary to the majority's suggestion, Maj. Op. 28–30, the scienter issue was hardly a secret at the time of Nasir's trial. The Supreme Court highlighted the constitutional importance of *mens rea* in *Staples v. United States*, 511 U.S. 600, 619–20 (1994) (government required to prove that defendant knew that the features of his AR-15 rifle brought it within the scope of machine-gun provision of National Firearms Act), and *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (in prosecution under Protection of Children Against Sexual Exploitation Act, government required to prove that defendant knew he was sending or receiving pictures of *minors* engaged in sexually explicit conduct). In 1995, a divided Fourth Circuit held that the government need not prove that the defendant in a § 922(g)(1) prosecution had the requisite scienter regarding his felony status. *United States v. Langley*, 62 F.3d 602 (4th Cir. 1995) (en banc). Subsequently, the scienter issue in § 922(g) cases continued to percolate in courts throughout the country. *See, e.g.*, *United States v. Games-Perez*, 695 F.3d 1104, 1116–24 (10th Cir. 2012) (Gorsuch, J., dissenting from denial of rehearing en banc); *United States v. Games-Perez*, 667 F.3d 1136, 1140–42 (10th Cir. 2012); *United States v. Butler*, 637 F.3d 519, 523–25 (5th Cir. 2011); *United States v. Olender*, 338 F.3d 629, 637 (6th Cir. 2003); *United States v. Enslin*, 327 F.3d 788, 798–99 (9th Cir. 2003); *United States v. Wilson*, 159 F.3d 280, 293–96 (7th Cir. 1998) (Posner, J., dissenting).

In our circuit, a district court anticipated *Rehaif* by a decade, holding that in a § 922(g)(1) prosecution the government must prove that the defendant knew of his felon status. *United States v. Kitsch*, No. 03-594-01, 2008 WL 2971548, at *7 (E.D. Pa. Aug. 1, 2008). And in prosecutions for the closely related charge of aiding and abetting a violation of § 922(g)(1),

4

we have long required the government to prove beyond a reasonable doubt that the defendant knew the possessor's status as a felon. *United States v. Xavier*, 2 F.3d 1281, 1286–87 (3d Cir. 1993).

Even though a timely scienter-based objection would likely have been overruled in 2017, the objection itself could have prompted the government to supplement the record with additional evidence of Nasir's *mens rea*. *See Pfeifer v. Jones & Laughlin Steel Corp.*, 678 F.2d 453, 457 n.1 (3d Cir. 1982) (contemporaneous objection rule "affords an opportunity for correction and avoidance in the trial court in various ways: it gives the adversary the opportunity either to avoid the challenged action or to present a reasoned defense of the trial court's action; and it provides the trial court with the alternative of altering or modifying a decision or of ordering a more fully developed record for review"), *judgment vacated on other grounds*, 462 U.S. 523 (1983). But Nasir—unlike Rehaif—did not preserve his scienter-based objection, so he deprived the government and trial court of these opportunities.

## B.     The nature of plain-error review

Rule 52(b) gives us discretion to correct plain error in such cases, but the rule is "permissive, not mandatory." *Olano*, 507 U.S. at 735. And our discretionary authority to remedy a forfeited error is "strictly circumscribed," *Puckett v. United States*, 556 U.S. 129, 134 (2009), though not as the majority appears to believe. The majority asserts that we have only "a degree of discretion in determining whether to correct [plain] error," which seems to suggest a presumption in favor of error-correction and that our discretion to ignore plain error is quite narrow. Maj. Op. 27.

5

The majority's parsimonious view of our Rule 52(b) discretion is contrary to Supreme Court precedent. We are to correct plain errors "sparingly," *Jones v. United States*, 527 U.S. 373, 389 (1999), and only in "exceptional circumstances," *United States v. Atkinson*, 297 U.S. 157, 160 (1936), where it is necessary to set aside "particularly egregious errors," *United States v. Young*, 470 U.S. 1, 15 (1985) (internal quotation marks omitted) (quoting *United States v. Frady*, 456 U.S. 152, 163 (1982)). Meeting all four prongs of the plain-error standard "is difficult, 'as it should be.'" *Puckett*, 556 U.S. at 135 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)). That is particularly true when, as here, curing the plain error would require the district court to conduct a burdensome jury retrial. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1909 (2018).

The reviewing court's exercise of prong-four discretion is an independent barrier to relief on a forfeited claim of error. Even "a plain error affecting substantial rights does not, without more, satisfy the *Atkinson* standard, for otherwise the discretion afforded by Rule 52(b) would be illusory." *Olano*, 507 U.S. at 737. Regrettably, we have sometimes conflated prongs three and four with little to no separate prong-four analysis. *See United States v. Gaydos*, 108 F.3d 505, 509 (3d Cir. 1997) (suggesting, without any prong-four analysis, that the plain error automatically satisfied prong four); *Xavier*, 2 F.3d at 1287 (same).

This case affords a rare opportunity for the en banc Court to disavow such imprecision and fine-tune its approach to plain-error review. Alas, the majority exacerbates the problem by declaring that the plain error in Nasir's case derogated his substantial rights *thus* satisfying *Olano* step four. Maj. Op. 62 (citing *Gaydos*, 108 F.3d at 509). Rather than conduct "a

6

case-specific and fact-intensive" review in light of the entire record, *Puckett*, 556 U.S. at 142, the majority simply assumes that plain error of an undefined "magnitude" categorically requires correction at *Olano* prong four. Maj. Op. 62.

## C.     Plain-error review requires consideration of the entire record

Casting aside the case-specific and fact-intensive approach required by *Puckett*, the majority asserts that "constitutional norms" require error-correction because the Supreme Court's decision in *Rehaif* retroactively created due process concerns. Maj. Op. 62. But framing the plain error as a due-process violation does not automatically satisfy *Olano* prong three or four. *See United States v. Marcus*, 560 U.S. 258, 264–66 (2010). That is because even constitutional rights "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Olano*, 507 U.S. at 731 (internal quotation marks omitted) (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)). So a defendant's failure to object at trial, even though the error was not plain at the time, "may well count against the grant of Rule 52(b) relief." *Henderson v. United States*, 568 U.S. 266, 278–79 (2013).

The Court in *Johnson* held only that an error that was not plainly incorrect at the time of trial becomes plain when the law is subsequently clarified. *Johnson*, 520 U.S. at 468. That is, the timing question concerned the "plainness" of the error, which relates only to *Olano* prong two. *See Henderson*, 568 U.S. at 279 (time-of-review rule adopted in *Johnson* and *Henderson* applies specifically to the second part of the four-part *Olano* test). The majority's insistence that our prong-four analysis is likewise limited to the time of trial (as memorialized

7

in the trial record) is unwarranted and finds no support in *Johnson*.

Indeed, having found that the error was plain, the Court in *Johnson* assumed without deciding that *Olano* prong three was satisfied and denied relief under prong four because the error did not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 469–70 (internal quotation marks omitted) (quoting *Olano*, 507 U.S. at 736). Two aspects of the Court's discussion are relevant here. First, the Court *itself*—and not the jury—found that the record contained enough evidence on materiality that no reasonable juror could have decided the materiality question[1] in any other way. *Id.* at 470; *see also United States v. Johnson*, 899 F.3d 191, 200 (3d Cir. 2018) (finding the trial record contained sufficient evidence to support defendant's conviction and declining to cure plain error at prong four, even though the jury was not instructed to find, and did not find, a required element).

Second, in making that finding the Court did not confine its review to information available only at the time of trial. Rather, it noted that "[m]ateriality was essentially uncontroverted at trial *and has remained so on appeal*." *Johnson*, 520 U.S. at 470 (emphasis added) (footnote omitted). Reviewing the case under the prong-four standard, the Court considered whether petitioner made a plausible showing[2]—not just at trial but

---

[1] The plain error in *Johnson* concerned the trial court's failure to submit materiality to the jury, as subsequently required in *United States v. Gaudin*, 515 U.S. 506 (1995). *Johnson*, 520 U.S. at 464.

[2] We have also previously used a "no-plausible-argument" or "no-plausible-explanation" test in deciding plain-error cases at

8

afterwards, before the Eleventh Circuit or the Supreme Court—that the false statement for which she was convicted was not material. *Id.* Satisfied that she had not, the Court affirmed the court of appeals' exercise of its discretion to decline to correct the plain error. So while the "plainness" of an error (prong two) is pegged to the time of trial, the broader question whether the plain error seriously affects the fairness, integrity, and public reputation of judicial proceedings (prong four) has a longer time horizon extending throughout the appeal process. *See Henderson*, 568 U.S. at 275 (the reviewing court examines *Olano*'s third and fourth criteria by "looking at *the circumstances that now are*," i.e., at the time of the appeal rather than by looking back to the time of trial).

The majority attempts to narrow the discretion provided by Rule 52(b) by ignoring its expansive text and cabining its temporal scope. Throughout its opinion, the majority insists that the discretion afforded by Rule 52(b) must be restricted to the time of the trial itself and to facts in the trial record. This is necessary, the majority warns, to avoid trampling on Fifth and Sixth Amendment rights in violation of *In re Winship*, 397 U.S. 358 (1970). Maj. Op. 32–33.

The majority misapprehends the nature and purpose of plain-error review, particularly at prong four. We do not purport to "find facts" in order to overcome a deficiency in the evidence and on that basis pronounce the defendant's conviction while relieving the government of its burden. Rather, as is clear from the entire line of plain-error cases before and after *Olano*, there is a material difference between our remedial

---

prong four. *See, e.g.*, *United States v. Greenspan*, 923 F.3d 138, 154–56 (3d Cir. 2019); *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 306 (3d Cir. 1997).

discretion under Rule 52(b) and the jury's factfinding role at trial. At prong four, we answer a question that no jury could ever appropriately entertain: whether, considering the entire record, reasonable observers would conclude that declining to correct the plain error creates a miscarriage of justice or would seriously affect the fairness, integrity, and public reputation of judicial proceedings generally.

Conversely, remanding for retrial on an uncontestable element may be "[t]he real threat" to fairness and undermine the reputation of judicial proceedings—a powerful truism that the majority does not acknowledge. *United States v. Cotton*, 535 U.S. 625, 634 (2002); *see also Dominguez Benitez*, 542 U.S. at 82 (plain-error review should enforce Rule 52(b)'s policy of reducing "wasteful reversals").

The majority's misconception of plain-error review infects its entire discussion of the record that we review under Rule 52(b). Because the majority regards plain-error review as a kind of extension of the jury trial rather than a discretionary act tethered to Rule 51(b)'s forfeiture rule, it fixates on *Winship*'s requirement of proof beyond a reasonable doubt in criminal trials. Maj. Op. 32–37.[3] Were we reviewing Nasir's conviction for sufficiency of the evidence, the majority's scruples would be more persuasive. But we are merely exercising remedial discretion over a forfeited objection, so unless the

---

[3] In response, the majority contends that what separates us is nothing less than fidelity to the "Constitution itself." Maj. Op. 34 n.17. But the majority ignores the thrust of my criticism. In a different case the majority's fixation on *Winship* would be salutary, but here it is misplaced because plain-error review is not a continuation of the jury trial.

majority intends to attack the constitutionality of Rule 52(b) generally, its analysis is misdirected.[4]

### D. By limiting plain-error review to the trial record, the majority creates a per se rule requiring error correction

We evaluate a claim of plain error "against the entire record" because "[i]t is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means." *Young*, 470 U.S. at 16. This case nicely illustrates why it is "simply not possible" to perform a prong-four assessment without considering the whole record. At prong three, we review only the trial record to determine whether the error affected the outcome of the district court proceedings. *See United States v. Maez*, 960 F.3d 949, 961 (7th Cir. 2020). If it did, then we move to *Olano* prong four. But if at prong four we continue to limit our consideration to the trial record we see only the prejudice that satisfied prong three in the first place. We cannot see—or more precisely, we pretend not to notice—Nasir's

---

[4] We do not "[d]isregard[] constitutional norms" in refusing to remand a case to the district court on plain-error review when the jury's verdict was obviously correct. Maj. Op. 62. Surely the majority is not suggesting that plain-error review is inapplicable whenever important constitutional rights are at issue; nor (I hope) is it suggesting that nearly all of our sister circuits are so unconcerned with the preservation of constitutional guarantees that they would disregard an obvious Sixth Amendment violation just for the sake of keeping a person behind bars. *See infra* at 12–13. Simply put, the majority's approach challenges the constitutionality of Rule 52(b)'s plain-error standard as explicated in Supreme Court decisions.

three prior felony guilty pleas[5] and his seven and one-half years of imprisonment. Thus blinkered, we cannot adopt the broader, outward-looking perspective necessary to determine whether public perceptions of fairness, integrity, and the reputation of judicial proceedings require us to cure the error.

The majority's crucial move—limiting the scope of our prong-four review—is dispositive in appeals from *Rehaif*-infected felon-in-possession convictions where, as here, the defendant stipulated to his felon status. Because of Nasir's stipulation, the government was precluded from adducing evidence relating to the nature and circumstances of his prior felony convictions. *Old Chief*, 519 U.S. at 174–75. For the reasons

---

[5] The majority is comfortable inferring a defendant's knowledge-of-felon status from his prior guilty plea because "when a defendant pleads guilty, the district court must ensure that the plea is knowing and voluntary." Maj. Op. 40. But the majority refuses to apply that same logic to Nasir, who knowingly and voluntarily pleaded guilty to felony charges on three separate occasions. Indeed, he even pleaded guilty to a prior felon-in-possession charge. So as the majority acknowledges, when he was tried for the same offense in this case he *necessarily* knew that he was a felon. This is precisely the sort of information that should inform our discretionary judgment at prong four. *See, e.g.*, *United States v. Huntsberry*, 956 F.3d 270, 285 (5th Cir. 2020); *United States v. Ward*, 957 F.3d 691, 695 (6th Cir. 2020). Nasir's plea to a felon-in-possession charge, which is the offense embodied in the *Old Chief* stipulation, is a central reason why this case is not one where allowing the conviction to stand would impugn the fairness, integrity, or reputation of judicial proceedings. *See also infra* at 16–18.

---

explained in *Old Chief*, shielding Nasir in that manner was appropriate at his jury trial. But post-trial, the unfair-prejudice and jury-misleading rationales of Federal Rule of Evidence 403 no longer obtain, which highlights the tension between *Rehaif* and *Old Chief* that Justice Alito noted in his *Rehaif* dissent. *Rehaif*, 139 S. Ct. at 2209 (Alito, J., dissenting). The majority's restriction of our prong-four review to the trial record effectively converts Nasir's *Old Chief* stipulation from a jury-trial shield into an appellate sword preventing this Court from considering facts relating to his scienter.

Allowing Nasir to deploy *Old Chief* offensively itself adversely affects the fairness, integrity, and public reputation of judicial proceedings. But limiting our prong-four review to the trial record is even more consequential. By short-circuiting the *Olano* analysis at step three, the majority predestines the result in appeals of *Rehaif*-infected felon-in-possession convictions involving an *Old Chief* stipulation—always in favor of error-correction. The combination of *Old Chief* and the majority's insistence that we may consider only the trial record, even at prong four, creates a per se rule requiring remand in every such case. That is precisely the type of "flawed" approach that the Supreme Court has disapproved because it renders our prong-four discretion "illusory." *Olano*, 507 U.S. at 737; *Young*, 470 U.S. at 16 n.14.

Given the Supreme Court's clear and repeated admonitions, the majority offers assurance that it is not advocating the adoption of a per se rule. Maj. Op. 50 n.29. But that disclaimer is meaningless; whether the majority intends to "advocate" the adoption of a per se rule, it has in fact created one. Gamely trying to demonstrate the flexibility of its per se rule, the majority offers two examples "where sufficient evidence was presented at trial to show that the defendant was aware of his status

13

as a felon at the time of the crime." *Id.* (citing *United States v. Moss*, 812 F. App'x 108, 111 (4th Cir. 2020), and *United States v. Velázquez-Aponte*, 940 F.3d 785, 800 (1st Cir. 2019)). Both cases are inapposite, however, because in neither did the defendant invoke the *Old Chief* bar by stipulating to his prior felony conviction.

Throughout its opinion, the majority discounts the impact of Nasir's *Old Chief* stipulation. Maj. Op. 47 n.26 ("[W]e think the existence of an *Old Chief* stipulation has little relevance to the analysis . . . ."). That is a massive blind spot.

> Because defendants typically avail themselves of *Old Chief* when they have multiple or damning felony records, it should come as no surprise that a reviewing court, conducting plain-error review, will find that the fairness, integrity, or public reputation of judicial proceedings has not been affected, when considering evidence of the defendant's felony status beyond just the trial record.

*United States v. Miller*, 954 F.3d 551, 559 n.23 (2d Cir. 2020). That is true here, as well. But by limiting our review to the trial record—which of course includes the *Old Chief* bar—the majority makes it impossible for us to perform the required prong-four analysis.

The majority has no answer to the outsized role of *Old Chief* in this case, except to implausibly suggest that Nasir's stipulation did not prevent the government from introducing his knowledge-of-status at trial. Maj. Op. 50 n.29. But precisely because of Nasir's stipulation, the trial court would almost certainly have sustained the inevitable unfair-prejudice objection because the evidence proving his felon status and

14

knowledge of status is substantially the same, or at least inextricably intertwined.

### E. The "entire record" is broader than the trial record

The majority leans heavily on *Johnson* for its holding that we may consider only the trial record on plain-error review, rather than the entire record. Maj. Op. 34–35. But *Johnson* was not a felon-in-possession case, so the trial record was not constrained by *Old Chief*. As a result, the evidence supporting materiality was so "overwhelming" that petitioner had "no plausible argument" at trial or on appeal. *Johnson*, 520 U.S. at 470. The lack of an *Old Chief* stipulation is highly relevant to the analysis in *Johnson* and distinguishes it from this case.

The majority's discussion of *Neder v. United States*, 527 U.S. 1 (1999), is even less persuasive. Maj. Op. 35 n.18. *Neder* was a harmless-error case decided under Rule 52(a), not a Rule 52(b) plain-error case. 527 U.S. at 7–8. *Olano* step three is essentially harmless-error analysis, and as the majority itself acknowledges, all agree that it is based on the trial record. Maj. Op. 44–45 (discussing *Maez*). But the move from step three to step four distinguishes this and other plain-error cases from *Neder*, and it is at step four that we are required to evaluate the case "against entire record." *Young*, 470 U.S. at 16. The majority's reliance on *Neder* in support of its trial-record-only holding underscores its persistent tendency to conflate *Olano* prongs three and four.[6]

---

[6] The majority's emphasis on the *amount* of evidence in the *Neder* trial record is curious, considering its heavy reliance on

15

Our sister circuits understand this quite well. As the majority concedes, the Second, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits have repeatedly affirmed jury verdicts in § 922(g) cases and rejected arguments similar to those accepted by the majority. *Miller*, 954 F.3d at 560; *Huntsberry*, 956 F.3d at 285–87; *Ward*, 957 F.3d at 695; *Maez*, 960 F.3d at 963–64; *United States v. Owens*, 966 F.3d 700, 706–07 (8th Cir. 2020); *United States v. Benamor*, 937 F.3d 1182, 1188–89 (9th Cir. 2019); *United States v. Reed*, 941 F.3d 1018, 1021–22 (11th Cir. 2019). Even *United States v. Medley*, 972 F.3d 399 (4th Cir. 2020), which the majority enlists for support, Maj. Op. 57–58, does not explicitly foreclose consideration of matters outside the trial record when addressing forfeited *Rehaif* claims under the plain-error standard. *Medley*, 972 F.3d at 417. *Medley* is already an outlier; the majority would go even further and place this Court beyond the pale.

At last count, 140 appellate judges and 15 district judges sitting by designation have voted to uphold a felon-in-possession conviction on plain-error review of a *Rehaif* claim. How could so many federal judges approve the obvious violation of important Fifth Amendment and Sixth Amendment rights? The

*In re Winship*. Maj. Op. 35 n.18. The defendant's Sixth Amendment right is to have all evidence proven beyond a reasonable doubt *to a jury*, not simply to have the government put a surfeit of evidence into a record. Yet, applying the harmless-error standard the Supreme Court affirmed Neder's conviction because there was enough evidence in the record to find an element of the offense—even though *the jury* never made such a finding. 527 U.S. at 16–18. *Neder* thus undermines rather than supports the majority's primary rationale in this plain-error case.

16

answer is that they haven't; our colleagues overwhelmingly understand the difference between judicial factfinding and plain-error remedial discretion.[7]

By holding that we may not review the whole record at prong four, the majority positions us on the short end of a lopsided circuit split. It fails to identify a "compelling basis" to do so, in defiance of our Court's "general[] reluctan[ce]" to create such splits. *In re Asbestos Prod. Liab. Litig. (No. VI)*, 921 F.3d 98, 109 (3d Cir. 2019) (internal quotation marks omitted) (quoting *Parker v. Montgomery Cty. Corr. Facility/Bus. Office Manager*, 870 F.3d 144, 152 (3d Cir. 2017)). More importantly, the majority's criticisms of our sister circuits' positions are mistaken.

Consider the majority's handling of the Eleventh Circuit's decision in *United States v. Reed*. The defendant in *Reed* was convicted by a jury of possessing a firearm as a felon, and the Eleventh Circuit affirmed his conviction. 941 F.3d at 1019. The Supreme Court vacated the Eleventh Circuit's judgment of affirmance in light of *Rehaif* and remanded for reconsideration. *Id.* On remand, the Eleventh Circuit once again affirmed. *Id.* at 1022. It held that an appellate court may review the whole record when assessing a *Rehaif* error's effect, or lack thereof, on the fairness, integrity, or public reputation of

---

[7] The majority sniffs that its decision is based upon "independent judgment" rather than simple nose-counting. Maj. Op. 49 n.28. That misses the point. Respectfully, my suggestion is that in exercising its independent judgment the majority has inadequately considered the extreme unlikelihood that so many of our judicial colleagues have somehow missed, or would casually ignore, the due process and Sixth Amendment concerns that the majority finds so troubling.

judicial proceedings. *Id.* at 1021–22. Because the defendant's presentence report "stated that he had been incarcerated for lengthy terms before possessing the firearm," *id.* at 1020, he could not prove that the error affected "the fairness, integrity, or public reputation of his trial," *id.* at 1022. Accordingly, the Eleventh Circuit declined to set aside his conviction. *Id.* at 1022.

The majority chides the Eleventh Circuit for relying on *United States v. Vonn*, 535 U.S. 55 (2002), and concluding that a court need not confine itself to the trial record at prong four, because *Vonn* involved review of a guilty plea rather than a conviction after a jury trial. Maj. Op. 39–40. But the majority ignores the Eleventh Circuit's discussion of *United States v. Young. See Reed*, 941 F.3d at 1021. In *Young*, the Supreme Court denied plain-error relief where a prosecutor made improper comments during rebuttal because the remarks were made in response to defense counsel's own improper remarks during summation and "were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." 470 U.S. at 16–19. The Court explained that it could not "properly evaluate [the defendant's claims of error] except by viewing [them] *against the entire record*," *id.* at 16 (emphasis added), because Rule 52(b) "authorizes the Courts of Appeals to correct only 'particularly egregious errors,'" *id.* at 15 (quoting *Frady*, 456 U.S. at 163).

The Supreme Court has never held that the "entire record" that *Young* instructs us to examine means just the trial record.[8] That would make no sense: reasonable people will

---

[8] In *Makiel v. Butler*, 782 F.3d 882 (7th Cir. 2015), the Seventh Circuit discussed the difference between the "entire record" and the "trial record" in a case involving the materiality

18

consider all relevant information in assessing whether our decision to affirm Nasir's conviction works a miscarriage of justice that is inconsistent with fairness, integrity, and the good reputation of our judicial system. And unlike the majority, they will not arbitrarily ignore the indisputable fact of Nasir's scienter and guilt. Maj. Op. 59–64. In deciding whether to exercise our discretion, we should consider reliable materials within and outside of the trial record just as thoughtful members of the public certainly will.[9]

---

standard of the Compulsory Process Clause. *Id.* at 908–10. Although *Makiel* was not a plain-error case, the court's discussion assists our consideration of the scope of discretionary review prescribed by *Olano*. Similar to our task at prong four, the court in *Makiel* had to evaluate the defendant's argument in light of public interests such as "the integrity of the adversary process, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." *Id.* at 909. The Seventh Circuit concluded that when the Supreme Court instructs circuit courts to evaluate claims of trial error in the context of the "entire record," that is broader than the "trial record." *Id.*

[9] Consider the prong-four significance of Nasir's *Old Chief* stipulation, which of course *was* part of the trial record. The majority suggests that it could never be even circumstantial evidence of his scienter, Maj. Op. 55–57, but that assertion is not compelled by *Rehaif.* And it wars against common sense and experience. As a strictly logical proposition, it is true that Nasir's stipulation proved only that he knew of his felon status as of the date of the stipulation; it did not *necessarily* prove that he knew he was a felon when he was arrested with the gun. But just as a factual statement can be strictly true and yet fraudulent

19

The majority also assails the Second Circuit's decision in *Miller* and the Seventh Circuit's decision in *Maez*. Its criticism of the approach taken by those two circuits is similarly unpersuasive.

*Miller* involved a defendant whose presentence investigation report showed that he spent several years in prison prior to his firearm possession, rendering it obvious that he knew he was a felon at the time of possession. 954 F.3d at 560. The Second Circuit "ha[d] no doubt that, had the *Rehaif* issue been foreseen by the district court, [the defendant] would have stipulated to knowledge of his felon status to prevent the jury from hearing evidence of his actual sentence." *Id.* at 560. So, the court concluded, the fairness, integrity, and public reputation of the judicial system would not be seriously affected by upholding the conviction; in fact, the defendant was so obviously guilty that *vacating* his conviction "would have that effect." *Id.* at 559. In *Maez*, the Seventh Circuit largely adopted the Second Circuit approach, concluding that vacating the convictions of two defendants whose presentence reports indicated that they served more than one year in prison on prior felony

---

because of a material omission, Nasir's stipulation does not foreclose the possibility that he also understood that he was a felon every day after his knowing and voluntary guilty pleas in 2000, 2001, and 2007. A thoughtful observer drawing upon her reason, experience, and common sense might easily infer from Nasir's June 2017 stipulation that he knew of his felon status when apprehended with a gun in December 2015. Such an inference, though not logically required, would be patently sensible to many people. And surely, many will consider his stipulation in this light when evaluating our discretionary decision whether to notice the plain error created by *Rehaif*.

convictions would negatively affect the fairness, integrity, and public reputation of judicial proceedings. 960 F.3d at 964–66.

The majority faults the Second and Seventh Circuits for "treat[ing] judicial discretion as powerful enough to override the defendant's right to put the government to its proof when it has charged him with a crime." Maj. Op. 46–47. But Nasir has not been deprived of that right. He had the opportunity to insist that the government be required to prove that he knew he was a felon at the time of his firearm possession. He did not do so, instead agreeing that no such proof need be presented. As a direct result of that choice, the government did not introduce evidence as to Nasir's knowledge of his status at the time of possession though such evidence was readily available. I do not see why Nasir's failure to object to the jury instruction and decision to instead avail himself of an *Old Chief* stipulation should continue to redound to his benefit now that we are exercising remedial discretion.

### F. Nasir does not satisfy *Olano*'s step-four standard for error-correction

Our sister circuits' approach does not "imply that relief on plain-error review is available only to the innocent." Maj. Op. 47.[10] If, for example, an error so corrupts a judicial

---

[10] Indeed, as the Seventh Circuit recognized, "defendants can sometimes show an effect on fairness or integrity without a claim of innocence." *Maez*, 960 F.3d at 962. But "though a defendant's likelihood of actual guilt or innocence does not necessarily control the third prong of plain-error review, it may play a role at prong four." *Id.* That is because a court has "broad discretion under prong four to leave even plain errors

21

proceeding as to make its verdict completely unreliable, no court would require a defendant to prove on appeal that he was actually innocent before vacating a conviction resulting from such a proceeding. *See Medley*, 972 F.3d at 424–25 (Quattlebaum, J., dissenting) (explaining that "central" to prong-four analysis in a criminal case "is a determination of whether, based on the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt" (internal quotation marks omitted) (quoting *United States v. Ramirez-Castillo*, 748 F.3d 205, 217 (4th Cir. 2014))). That is because the Third Branch would not want to put its imprimatur on a proceeding that makes a mockery of justice and reduces the system's standing in the eyes of the public. But that is not a problem here. A simple, unobjected-to error in jury instructions, where the defendant's conviction would have been certain had an objection been made at the proper time, does not cry out for an exercise of our discretion.

Remanding this case for retrial is unnecessarily burdensome and seriously undermines the fairness and public reputation of judicial proceedings. That broad inquiry is the standard governing our exercise of discretion. The majority compounds its error by explicitly limiting our prong-four discretion to Nasir's trial, which, it insists, "is the only judicial proceeding at issue." Maj. Op. 41 n.22. Not so. At prong four we ask whether refusing to cure the plain error would "seriously affect the fairness, integrity or public reputation of judicial proceedings" *generally*, not merely the particular defendant's proceeding. *Puckett*, 556 U.S. at 135. As the Court elaborated in *Puckett*, we consider whether affirming Nasir's conviction

---

uncorrected where [it has] no doubt as to the ultimate result of further proceedings." *Id.* at 963.

would call into question "the integrity of *the system*" and be so ludicrous as to "compromise the public reputation of *judicial proceedings*." *Id.* at 142–43 (emphasis added); *see also United States v. Edgell*, 914 F.3d 281, 291 (4th Cir. 2019); *United States v. Marroquin*, 884 F.3d 302, 304 (5th Cir. 2018) (Smith, J., dissenting from denial of rehearing en banc); *United States v. Gonzalez-Huerta*, 403 F.3d 727, 739 (10th Cir. 2005) (en banc); *id.* at 742 (Ebel, J., concurring); *id.* at 747 (Hartz, J., concurring). Because the majority asks the wrong prong-four question, it refuses to consider information that would suggest the correct answer.

Even if we improperly limited our prong-four inquiry to what the majority erroneously describes as "the actual field of play – the trial," Maj. Op. 41 n.22, we should still affirm. When asked twice at oral argument how Nasir would attempt to disprove the knowledge-of-status element if the case were sent back for retrial, his counsel was unable to give a responsive answer. (That is not a criticism of counsel's performance; there is no plausible explanation.) Instead, counsel allowed that Nasir would strategically use a remand to try to negotiate a better plea deal. In light of that revelation, I believe that thoughtful members of the public would view the majority's judgment and Nasir's windfall with bemused cynicism rather than reputation-enhancing admiration.

### G.     We are bound by the Supreme Court's plain-error precedent

The majority at least purports to apply *Olano* and its progeny. Judge Matey's opinion strikes out in an entirely different direction, citing first principles. I endorse that approach in cases where lower court judges write on a blank slate, but in this appeal we are guided by ample Supreme Court precedent.

23

In any event, although we have not had the benefit of original-ist briefing and argument, I doubt that Rule 52(b)'s remedial discretion as currently applied offends the Sixth Amendment and note that Justices Scalia and Thomas both joined *Olano* without any reservation, originalist or otherwise. *Cf.* Concurring Op. 13–16 (criticizing *Atkinson* and *Olano* as allegedly unwarranted expansions of original plain-error doctrine). Moreover, I fail to grasp how a purportedly originalist application of plain-error review can affirm the conviction of *non-criminal conduct* but disallows the conviction of conduct that was certainly criminal but not properly proven. *Cf. United States v. Jabateh*, 974 F.3d 281, 287 (3d Cir. 2020).

\*\*\*\*\*

The Supreme Court has disapproved "a reflexive incli-nation by appellate courts to reverse because of unpreserved error," a tendency contrary to the "strictly circumscribed" appellate-court authority to remedy unpreserved error only where necessary due to exceptional circumstances. *Puckett*, 556 U.S. at 134 (internal quotation marks omitted) (quoting *United States v. Padilla*, 415 F.3d 211, 224 (1st Cir. 2005) (Boudin, C.J., concurring)). Yet the majority persists in the face of overwhelming, reliable information supporting Nasir's conviction. Its error stems from a basic misunderstanding of the nature of plain-error review. I respectfully dissent from Section II.E of the majority opinion.

24